## THE STATE OF NORTH DAKOTA EX REL. H. E. DORVAL v. J. K. HAMILTON as Auditor of Cavalier County, North Dakota.

(129 N. W. 916.)

Constitutional Law — Voters and Elections — Special Legislation — Uniformity of Laws.

1. The primary election law of this state, in common with all general laws

Note.—The question of the validity of primary election laws has been treated, with a review of all the authorities, in a note in 22 L.R.A.(N.S.) 1136, while the cases which has passed upon the question whether primary elections are "elections" within the meaning of Constitutions or statutes relating to elections generally are collated in a note in 18 L.R.A.(N.S.) 412.

regulating the elective franchise, is in all its parts within the constitutional requirements that it must be just and reasonable, must have a uniform operation throughout the state, and must bear with substantial equality upon parties, candidates, and all classes of citizens.

**Constitutional Law — Voters and Elections — Special Legislation — Classification.**

2. In case it is apparent that from the nature of a general law and the ends it purposes to effect that its aims can be attained only through the medium of groups or aggregations of persons, a certain classification of objects to be affected differently by the operation of the law may be made. Such classification, if made, however, must rest upon some difference which bears a true and just relation to the act in reference to which the classification is proposed, and must be reasonable and natural, not artificial or arbitrary.

**Constitutional Law — Voters and Elections — Uniformity of Laws — Classifications.**

3. A standard prescribed by a general law for the determination of a basis of classification that is from its nature and character unstable, illogical, inconstant, and arbitrary cannot serve as a means for the computation of groups that must bear to it and to each other the natural, constant, and unvarying relation required by the Constitution; and a law that operates diversely upon classes so determined cannot have a just, reasonable and uniform operation.

**Constitutional Law — Primary Elections — Special Legislation — Classification.**

4. Under the provisions of the general primary election law, the classification provides by the requirement of § 12, chap. 109, Laws of 1907, to the effect that no nomination shall be made unless the vote cast for state, district, or county offices is at least 30 per cent of the total number of votes cast for the candidate for secretary of state of each political party at the last general election, is arbitrary, unnatural, and lacks uniformity in the different counties of the state, by reason of the fact that the standard provided for determining the basis of classification places the party group authorized to make a nomination in each county in a relation to the actual party strength and to each other that is unstable, inconstant, and without uniformity in the different counties of the state. Such provision of the law is therefore unconstitutional and void. On this point the holding of State ex rel. Montgomery v. Anderson, 18 N. D. 149, 118 N. W. 22, is overruled.

Opinion filed December 24, 1910.

Appeal from Cavalier county; *Honorable W. J. Kneeshaw, J.*
Mandamus by the State of North Dakota on the relation of H. E.
20 N. D.—38.

Dorval against J. K. Hamilton as auditor of Cavalier county, North Dakota. Writ denied and plaintiff appeals.

Reversed.

*Jeff M. Myers, W. B. Dickson (Engerud, Holt, & Frame, of counsel), for appellant.*

*W. E. McIntyre, J. B. Wineman,* and *F. E. Smith,* for respondent.

ELLSWORTH, J. The name of appellant was regularly upon the ballot used at the primary election of June 29th, 1910, as Democratic candidate for nomination to the office of county judge of Cavalier county. At such election he received 341 votes, and there were no votes cast for any other person as Democratic candidate for nomination to such office. These facts were shown by the abstract of the county canvassing board which canvassed the result of said primary election, and within a reasonable time after the preparation and filing of its abstract, appellant demanded of the defendant to this action as county auditor of Cavalier county that his name be placed upon the official ballot to be used in said county at the next general election as Democratic candidate for the office of county judge. This the defendant refused to do, and declared his purpose to omit the name of appellant from such ballot, stating as the ground of his action in the premises and the only reason and excuse therefor, that notwithstanding the fact that appellant received the highest number of votes cast for any person for nomination as Democratic candidate for the office of county judge of said county; he did not receive a vote equal to 30 per cent of the total number of votes cast for the Democratic candidate for secretary of state, in said Cavalier county, at the general election of 1908. At such general election, it appears that Joseph Mann, the Democratic nominee and candidate for secretary of state of North Dakota, received a total vote in Cavalier county of 1,152, of which 30 per cent is 346. At the primary election of June 29, 1910, more than 346 electors of said county called for and used Democratic primary election ballots; but such persons voted for appellant to the number only of 341, as above stated.

After a formal showing of the facts hereinbefore narrated, appellant applied to and received from the district court for Cavalier

county an alternative writ of mandamus requiring defendant, as audi-
tor of said county, to place his name upon the official ballot to be used
at the general election of November, 1910, or to show cause why he
should not be required to do so. The county auditor, as such defend-
ant, thereupon interposed a demurrer to the allegations of said alter-
native writ on the ground that the same did not state facts sufficient
to constitute a cause of action, and are not upon their face sufficient
to authorize the granting of the relief mentioned in the alternative
writ or any relief whatever. Upon a hearing duly had the district
court sustained defendant's demurrer, and directed that the alterna-
tive writ of mandamus issued to him be quashed and dismissed. From
such order of the district court this appeal is taken.

Upon the hearing before this court the defendant justifies his de-
clared purpose to omit the name of appellant from the official ballot
to be prepared by him for the general election of November, 1910,
by reference to that portion of the primary election act in force at
the time, in these words: "If the total vote cast for any party candi-
date or candidates for any office for which nominations are herein
provided for shall equal less than 30 per cent of the total number
of votes cast for secretary of state of the political party he or they
represented at the last general election, no nomination shall be made
in that party for such office, but if 30 per cent or more of such vote
is cast, and there is more than one candidate for any such office, the
person receiving the highest number of votes shall be declared the
nominee of such party for such office." Laws 1907, chap. 109, § 12.
Appellant admits that if this law is operative and applicable to nomi-
nations for the county officers, its provisions would appear to war-
rant the acts and attitude of defendant; but claims that that portion
of the act quoted above, in so far as it authorizes the omission of
appellant's name from the general election ballot, is an unreasonable
and unwarrantable exercise by the legislature of the police powers of
the state, and is therefore unconstitutional and void.

The principal question presented by this appeal is not before this
court for the first time. Two years ago, in a case presenting points
that, in the abstract, seem to be identical with those of the case at
bar, a majority of this court concurred in holding: (1) That the
provisions of § 12, chap. 109, Laws of 1907, apply to district and

county as well as state offices; and (2) that as a regulation of the elective franchise its requirements are reasonable, and not within the inhibition of any constitutional limitation. State ex rel. Montgomery v. Anderson, 18 N. D. 149, 118 N. W. 22. With the first holding this court as at present constituted fully agrees, and in its application to the case at bar we simply reiterate our adherence to that principle. Highly important and in a sense controlling in the disposition of the case at bar, however, are considerations that were not present in the case of State ex rel. Montgomery v. Anderson. At the time of the decision of that case but one election had been held under the primary election law enacted in 1907, and the survey of its practical operation then presented to the court was obviously limited and obscure. The court, from the very necessity of the case, was compelled to form its judgment largely upon abstract principle, and to base the same upon facts that might be expected to arise out of the practical operation of the law, rather than on those that had arisen. While, therefore, we still adhere to much of the general principle announced in the case of State ex rel. Montgomery v. Anderson, a majority of this court, under the additional facts now brought to its consideration, feel impelled to a conclusion materially at variance with that therein announced.

It is now well settled that under the Constitution of this state, the legislature may adopt measures regulating the exercise of the elective franchise in the nomination of candidates by political parties, as well as in the election of public officers. It is equally well recognized and settled that such regulation must be just and reasonable, and operate on voters and candidates of the same class with substantial equality. This latter principle was unequivocally recognized in the decision in the case of State ex rel. Montgomery v. Anderson, and we accept it without material qualification. In applying it to a determination of the facts of this case, however, it is necessary that we should delve somewhat below the principle itself and determine the constitutional fundament on which it rests.

Thus examined it will be observed that at least three important provisions of the Constitution are interwoven more or less closely with the basis of this principle: (1) Intimately associated as is the elective franchise with the general rights of citizens, all attempted regu-

lation necessarily comes within the scope of the immutable Declaration of Rights contained in § 1 of the Constitution; (2) all legislative regulation of the elective franchise throughout the state is a general law, that must bear with substantial equality upon parties, candidates, and all classes of citizens, or, in other words, must have a uniform operation as required by the Constitution, § 11; (3) while rising as a corollary from the last preceding proposition, is the constitutional guaranty that "no citizen or class of citizens shall be granted privileges or immunities which upon the same terms shall not be granted to all citizens." Const. § 20.

Viewed in these constitutional lights, the reason underlying the principle that legislative regulation of party nominations must not only be just and reasonable in its requirements, but must bear with substantial equality upon the rights of all groups or classes of citizens affected by its operation, is at once apparent. It is clear beyond question that in the concrete application to the facts of a case such as this of the foregoing principle, the term "classes," as therein used, includes within its scope the respective political parties, not only in their state-wide organization, but in these smaller groups comprising the party membership in the different counties. Therefore, in failing to comply with the tests prescribed by this precept, such attempted regulation falls under the ban of "class legislation" pronounced against those laws that practically operate in such manner as to affect diversely various persons or aggregations of persons not differentiated from each other by any natural or reasonable lines of demarcation.

It is doubtless true that, notwithstanding constitutional inhibitions such as those contained in §§ 11 and 20, the legislature may provide a certain classification of citizens to be differently affected by the same general rule. The limitation imposed upon legislation of this character is, however, that any classification provided as the basis for distinctive or special operation of the law must be natural, not artificial. "It must stand on some reason having regard to the character of the legislation." Edmonds v. Herbrandson, 2 N. D. 270, 14 L.R.A. 725, 50 N. W. 970. "It must rest on some difference which has a reasonable and just relation to the act in respect to which the classification is proposed." "It is not necessary that a law shall operate upon all alike, but . . . it must operate alike upon all

who are in like situation. The law need not have a universal operation, but it must be uniform. Proper classification is permitted, but arbitrary and unreasonable discrimination is forbidden." Beleal v. Northern P. R. Co. 15 N. D. 318, 108 N. W. 33. It must "rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis." Gulf, C. & S. F. R. Co. v. Ellis, 165 U. S. 155, 41 L. ed. 668, 17 Sup. Ct. Rep. 255; Powers Elevator Co. v. Pottner, 16 N. D. 359, 113 N. W. 703.

Nothing more than a casual survey of the primary election law is necessary to demonstrate that it is not designed to operate with absolute uniformity upon the rights of individual citizens. On the other hand, from a consideration of its nature and the ends it purposes to effect, it is clearly apparent that its declared purpose can be carried out only through the medium of groups or aggregations of persons with little reference to individual rights. Under a system such as this, proper classification becomes a necessity. The classification prescribed by the law is somewhat complex, regulating, primarily, the respective rights of political parties in their entirety and in their relation to each other; and, secondarily, the rights and powers of that portion of each party in the state at large and in the political subdivisions thereof, authorized to give expression to the party will; in its relation to the entire membership, state or local, as the case may be. As classification, within the limits hereinbefore mentioned is permissible, the only further inquiry pertinent to our investigation is, Are the groups defined by the law differentiated from each other reasonably, and not arbitrarily, and is the relation of each group to the basis of classification constant, just, and natural?

Applying these tests, there can be no question but that the classification primarily declared on the well-defined lines of party organization is natural and reasonable. This narrows the field of our research to a consideration of the secondary classification by which is prescribed the means of estimating the entire party strength, and the proportion thereof, that in each political subdivision may declare the party will to make a nomination under the provisions of the law.

The reason that renders expedient a provision that 30 per cent of the party strength shall be represented in order to make a party

nomination is discussed at considerable length in State ex rel. Montgomery v. Anderson; and the conclusions there grouped under three different heads might, we think, be summarized in the general principle, that the legislative purpose in inserting this clause was to define what in the operation of the law shall be accepted as an expression of the will or intent of a political party to make a nomination for a certain office; and, incidentally, to restrain the action of voters within the lines of the party to which they belong. The purpose is legitimate and proper, but its expression in the law introduces a certain difficulty by making it necessary for the legislature to further enact some means of forming a just estimate of party strength at a given period. If it were practicable to take a census of the different political parties, at stated intervals, a safe and sure method of determining their numerical strength within the state and its political subdivisions would be thus provided. As there is not, and from the very nature of the case probably could not be, a census of this kind, it follows that some other means of determination must be devised. Through this impossibility of exact computation, the legislature was driven somewhat into the realm of conjecture, and there compelled to select a measure of party strength whose best promise was that of reasonable approximation to actual fact. The total number of votes cast for the candidate for secretary of state of each political party at the last preceding general election was fixed as the standard of party strength. By adopting this measure and declaring a constant ratio of 30 per cent between the number so determined and the number necessary to make a nomination applicable alike to state, district, and county offices, as before suggested, the legislature has declared a classification of objects upon which the law shall operate not only in the state at large, but in each county of the state. It therefore becomes necessary, in order that the statute may not be violative of the constitutional principles that serve as landmarks to our investigation, that the party fraction authorized to make a nomination shall in each county of the state bear a constant, just, and uniform relation to the basis upon which it is classified, or, in other words, to the party strength in that county.

It is readily perceived that the character of that entity which serves as the basis of classification is an important and powerful factor in determining the quality of any reasonable system of grouping. If the

basis is logical, natural, and real, the entire classification will partake of the same character. If the basis is shifting, inconstant, arbitrary, or artificial, it is apparent that any grouping founded thereon is as a house built on the sand, without stability, strength, or uniformity. In determining the character of this classification, we will test it by resort to governing principles applied in the light of special facts attending the operation of the law in those instances in which its practical workings are brought to our notice.

At this point in our investigation appellant invites our attention to certain statistical facts now a part of our public history, with reference to the practical operation of the primary election law, which bear with direct and material force on the controlling principle of our decision. At the general election of 1908, in Bottineau county, the Democratic candidate for secretary of state received 1,148 votes. At the primary election of 1910 the highest number of Democratic ballots called for and votes in that county was 351. By the application of the 30 per cent rule 345 votes, or 98 per cent of the highest number of that party voting at that election was necessary to enable it to make a nomination for any county office whatever. In Stark county the entire number of votes cast for the Democratic candidate for secretary of state in 1908, was 464. The Democratic vote at the primary election of 1910 was 150. As 139 votes were necessary to nomination, it required 93 per cent of the party vote cast at this election to nominate. In Morton county the vote cast for the Democratic candidate for secretary of state in 1908 was 908. The Democratic vote at the primary election of 1910 was 201. As the number required to nominate was 272, it would require 136 per cent or 36 per cent more than the entire party vote cast at the primary election to make a nomination. A discrepancy still more highly magnified between the party strength as ascertained by the provisions of § 12, Laws of 1907, and that shown by the practical result of participation in an election, is that returned from Adams county where the vote cast for the Democratic candidate for secretary of state in 1908 was 182. The highest Democratic vote at the primary election of 1910 was 13. The number required to nominate was 55, and in order to make a nomination it was necessary for the Democratic party to cast a vote equivalent to 424 per cent of its entire strength as demonstrated

by its vote at the primary election. As these statistics are selected at random from a list of the counties of the state, it is a fair inference that conditions thus shown to prevail in *any* county obtain in *every* county, differing only in degree.

It is urged that the comparatively small use of ballots prepared for the Democratic party at the primary election of 1910 is due to the fact that in all of these counties a large proportion of the members of that party, instead of calling for and voting the ballot provided for them, became so interested in the Republican nominations that they voluntarily called for and used Republican ballots instead. There is no proof, however, of such assertion, and to accept it would require that this court should presume that reputable and law-abiding citizens in large numbers, and in all parts of the state, deliberately violated the purpose and intent of the primary election law and laid themselves liable to certain penalties. We are not permitted to indulge such presumption as this. On the other hand, the inference that properly and naturally arises is that, pursuant to the provisions of the law, the members of each party called for and used the ballots provided for that party, and that the vote cast at the primary election of 1910 was a fair indication of the strength of the party in that county as it existed at that time.

It is further apparent that the vote of a party candidate for secretary of state at a general election is much more likely to be unduly magnified or diminished by causes that operate locally than the party vote at a primary election. It is a well-known fact that any candidate for a state office, without reference to his party affiliation, receives a vote in each county which increases or diminishes in direct proportion to his personal popularity in the locality in which the vote is cast. At a general election his name appears in a party column on the ballot which is given alike to voters of all parties.

Whether or not it be true, as sometimes stated, that the law countenances rather than discourages the voting of a split ticket, it is unquestionably true that it provides every facility for the accomplishment of that purpose by the voter. The voter, screened from observation and outside influence, with the name of the candidates of all parties on the ballot before him, in his markings, may readily pass from one column to the other, and, by voting for a candidate of a party

other than his own, perform an act that is not censurable, and is, in many instances, creditable. An honest and law-abiding citizen may, therefore, at a general election, freely vote for the candidate of a party other than his own, without incurring either a consciousness of having failed to observe the law, or any penalty for its violation. The result is, it will be noted, the exact converse of a like act performed at a primary election. It is therefore fairly inferable that the entire party vote cast at a primary election in any county is a much more reliable measure of the party strength, at that time, than the vote received by the candidate of that party for secretary of state at the general election held more than eighteen months before. If the vote at the primary election be regarded as the true standard of party strength at that time existing, however, it is at once apparent that in practical operation the primary election law outrages party rights, as, in instances such as those cited above. In order to make a nomination that will be officially recognized, a party must in some counties cast votes that exceed in numbers many times its entire strength, and in others produce a percentage of its strength so large as to be clearly unreasonable.

Whether or not in actual fact the measure of party strength prescribed by the primary election law, in its relation to the party group authorized to declare the party will, produces results that in this manner shock all sense of reason and justice, we think it clearly appears that the vote cast for a party candidate for secretary of state, at a preceding general election, is not a true, just, or stable basis for estimating the existing strength of the party at a primary election; and that the party group authorized to make a nomination, whose numbers are computed at a percentage of such vote, does not in the different counties of the state stand in true, just, constant, and uniform relation to the actual party strength, the fact on which the classification provided by the primary election law is obviously designed to rest. If the means provided by the law operated to determine with reasonable accuracy the party strength, we might hesitate to hold that the requirement that 30 per cent of that strength be necessary to constitute an expression of the party will was unreasonable. The percentage seems large, but the legislature having so declared, this court could not in a matter of expediency "run a race with the legislature" and assume that its

act was unwarrantable. If the percentage was greatly advanced and fixed at 60 per cent, however, all fair-minded men would agree, we think, in declaring it excessive; and certainly if 75 per cent was the number required, there could be no question but what all reasonable bound was exceeded. Yet, here we have a provision of law that, while it apparently contemplates a number equivalent to but 30 per cent of the estimated party strength as necessary to give expression to the party will, yet, as is shown by practical operation, by means of an arbitrary, false, and inconstant standard established as a measure of the basis of classification, may result in requiring in one county 98 per cent, in another county 136 per cent, and in another 424 per cent of the entire party vote as cast at an election actually held, to be given to the candidates for a certain office, before the party can nominate a candidate for that office. Any feature of an election law that in its practical operation produces results such as these can only be regarded as an unreasonable regulation of the elective franchise. Therefore, while the requirement that that portion of a party authorized to make a nomination shall bear a ratio of 30 per cent to the actual party strength may not be unreasonable, the system of classification adopted in determining therefrom the numbers of the party group that may act in making a nomination, in practice produces results that lack reasonable uniformity in the different counties of the state; and under which the basis of classification does not bear to the thing classified that natural, constant, and unvarying relation required by the Constitution.

In view of the foregoing considerations, it becomes necessary for us to hold that § 12, chapter 157, Laws of 1907, is not a just and reasonable regulation of the elective franchise, and does not operate on voters and candidates of the same class with substantial equality. We regret that this conclusion operates to overrule the holding of the court upon the same point in State ex rel. Montgomery v. Anderson. Such holding has been the law of the state for two years and more. It is not a rule of property, however, upon which any party could have acted to his pecuniary disadvantage during that period. It is merely a rule of construction which for obvious reasons may be changed with greater facility to accord with varying conditions and the somewhat broader view obtained by this court from a more ad-

vanced standpoint. We believe that a proper regard for the constitutional guaranties and safeguards of our citizens requires that this feature of the primary election law should be held inoperative. The other provisions are, of course, unaffected by this holding.

The order of the District Court is reversed.

All concur, except MORGAN, Ch. J., and SPALDING, J., who dissent.

SPALDING, J. (dissenting). This appeal presents the identical question decided in State ex rel. Montgomery v. Anderson, 18 N. D. 149, 118 N. W. 22. In that case a majority of the court held that the 30 per cent requirement in the primary election law was intended to prevent the nomination of candidates by accident, and to prevent a nomination when the party did not intend to make one; to restrain the action of voters at primary elections within the parties to which they belong; and to define and fix the number of votes necessary to constitute an expression of the party, and to determine what is the act of a party as a party, and that, while undoubtedly simpler and perhaps more effective or reasonable rules and regulations might have been provided than this provision furnishes, yet that that was a question for the legislature, and not for the courts, as long as the method provided was not clearly unreasonable, and that the feature complained of was not so unreasonable as to justify the court in holding it to be invalid. The different political parties accepted and acted upon the decision of the court in that case until the fall of 1910, when a political exigency and the fact of this court having in the meantime been increased in numbers by the addition of two members, furnished the appellant the occasion, as well as the excuse, for reopening the question. No new reasons for holding the provision invalid were advanced on argument, and it has been conceded that the position of the appellant and the opinion of the present majority of the court is without support by any reported authority. It is also conceded that the question of per cent is at most of trifling significance; that the same principle would be involved and the law equally invalid if the per cent were either considerably greater or materially less. The arguments presented were confined almost literally to the suggestions of Judge Fisk, made in the dissenting opinion in the Anderson Case. I construe them analyzed as resolving into at most

only two propositions: First, that the legislature has not provided the most efficient and the simplest method or classification which it might have found to accomplish its purpose; second, that because of the changes of residence, of political faith, or a decrease in party interest or loyalty, the fixing of the standard as the party vote cast at the general election next preceding the holding of the primary (less than twenty months), relates to a time so remote as to be unreasonable. The reasons which appeal to me most strongly, in support of the law, were stated in the opinion of the court in the Anderson Case, to which I refer, and a restatement of those reasons is unnecessary. I shall therefore address my suggestions to the argument of the majority of the court in its opinion in the case at bar.

The proposition that the law is invalid because the legislature has not provided the most efficacious and the simplest method of arriving at or enforcing the principles in view, and the object sought to be attained by the provision questioned, requires but brief comment. If the legislative assembly were required to discover and only provide the wisest, most efficacious, or the simplest plan known for accomplishing the object sought to be attained, in all the numerous laws from time to time enacted by it, particularly those relating to the administration of the fiscal affairs of state and its various subdivisions, and the exercise of the right of franchise, one would be left in some doubt as to the validity of most of our laws relating to such subjects. If any legislature ever attains that degree of superior wisdom and perfection which enables it in all such cases to see and affirmatively act upon the wisest method, it may well be held up to the attention of the civilized world as the only perfect and allwise legislative body known to history. I am unable to grasp any such principle. Apply this test to our revenue laws, as well as to many others, and I fear that they would shortly cease to operate, and the state and all its subdivisions would be found bankrupt. The logical, as well as practical, effect of adhering to this doctrine, would only result in disaster, as must be clearly apparent.

It is said in the majority opinion that, "by adopting this measure and declaring a constant ratio of 30 per cent between the number so determined and the number necessary to make a nomination applicable alike to state, district, and county offices, as before suggested, the legis-

lature has declared a classification of objects upon which the law shall operate not only in the state at large, but in each county of the state," and that to render the law valid it must not violate the principle that the party fraction authorized to make a nomination shall in each county of the state bear a constant, just, and uniform relation to the basis upon which it is classified, or, in other words, to the party strength in that county. It then proceeds to assume that the party strength is evidenced by the party vote at the primary, rather than at the general, election next preceding, and that because the statute fixes the measure of the party strength as its vote at the general election, rather than at the primary, it is invalid. In their discussion of this principle, and possibly out of undue consideration for the court, as constituted when the Anderson Case was decided, it is said with reference to that decision that "the court, from the very necessity of the case, was compelled to form its judgment largely upon abstract principle, and to base the same upon facts that might be expected to arise out of the practical operation of the law, rather than on those that had arisen. While, therefore, we still adhere to much of the general principle announced in the case of State ex rel. Montgomery v. Anderson, a majority of this court, under the additional facts now brought to its consideration, feel impelled to a conclusion materially at variance with that herein announced." In other words, that the difference between the votes of the election of 1908 and the primary in 1910 furnishes a reason, not formerly before this court, for holding the provision in question invalid. This reason leads to the result that when a party is on the increase, and the vote at any election is greater than that at the preceding election, the regulation or classification of the state will be reasonable and therefore valid as to party, but at the time invalid as to any party whose adherents decrease in number from year to year. To me, this is a novel doctrine. But assuming this line of reasoning to be applicable and proper, it appears to me that the court has omitted a factor necessary to be considered in determining the reasonableness or unreasonableness of the regulation or classification, and which must be stated to enable one to arrive at a correct conclusion.

Notwithstanding the decrease shown in the vote of one party between the 1908 election and the 1910 primary, the members of that

party resumed their allegiance at the 1910 general election, and the vote of that party regained its normal proportions. The returns show that in one of the counties referred to the vote of that party in November, 1910, exceeded the party vote cast in 1908, while in the others it was not disproportionate, although slightly smaller. I have not taken pains to make an examination of the vote cast in counties not named, but am content to suggest that the figures given, when supplemented by those of the same party cast at the 1910 general election, fall somewhat short of furnishing the mathematical demonstrations of the unreasonableness and invalidity of the law attempted, but that if they tend to prove anything in this direction, it is that enough members of one party were so apathetic, that they neglected to participate in making nominations, or that many in some counties were so disloyal to their party and indifferent to the prohibitions of the statute, that they preferred a voice in making nominations of another party, to having their own represented on the ballot, and thereby prevented nominations being made in some instances.

Applying the reasoning of the majority opinion to these facts leads to the further conclusion that the regulation or classification complained of was unreasonable in June, 1910, but on the return of the voters to the party in November, 1910, this provision became reasonable again. If the question is one of determining when the party census must be taken on which to base a decision of the question whether a party has acted, or expressed its opinion as to candidates for nomination, then it is purely a question of judgment. No party is likely to complain that it cast a large vote at a general election. Its ground for complaint is not against the law when its members desert the party and participate in the nomination of the candidates of another party at the primary. Its primary remedy lies in the direction of the advocacy of principles and the nomination of candidates which appeal to its members to lend them their support. The logic of the situation is that the appellant in this case appeals to the court to relieve him from the defeat occasioned by the inconstancy of the members of his party, or for the unattractiveness of the program which it presented to the voters, or, what is more probable, disapproval of his candidacy. He asks this court to nominate him for

an office for which the legislature and the voters have said he is not nominated.

The vote at the general election of 1910, as compared with that at the general election of 1908, hardly indicates that an appeal on the second ground mentioned is necessary, but when the vote in November, 1908, and 1910, are compared with the primary vote of 1910, a shocking lack of party loyalty seems to be disclosed in a few localities. It happens on this occasion to apply to one of the great parties, but it is just as likely to apply to the other some other time. For this reason I am unable to discover that the mere circumstance of this applying to one party at this time, and placing it at a disadvantage in certain localities in certain matters only, is fatal to the law. As far as we know it may at this time apply to the other party also. As a matter of classification it is not questioned that some regulation is necessary, otherwise the number of party ballots to be printed at public expense would be innumerable. Any classification of this nature is in a sense arbitrary. The legislature might with just as great reason have fixed it at 29 or 31 per cent. The difference would be so inconsequential as to be unnoticed. But in my apprehension this question of classification has been reached from an erroneous standpoint by the majority of this court. The question is: Is a classification provided which operates with substantial uniformity as between the parties? Not as between counties. Yet it does operate with substantial uniformity between counties or other subdivisions, because the same conditions effect the same result in one county as in another. The fact that one county casts less than 30 per cent, and another more, at the primary does not destroy the uniformity of application of the provision complained of. If neither casts 30 per cent, a candidate for neither party is nominated by the primary method. If the failure to nominte in any subdivision of the state resulted in a total failure of candidates for a party, or in the prevention of the organization of new parties, a different question might be before us, but as held in State ex rel. Hagendorf v. Blaisdell, — N. D. —, 127 N. W. 720, the law provides for new parties, and secures them the same privileges at elections that old parties have, and ample means. is provided for placing the names of candidates with their party designation on the ballot used at the general election, irrespective of the

result of the primary. According to the majority opinion, the party census must be taken as disclosed by the vote at the primary. In the legislative judgment, the appropriate time to take a party census is at the general election. This is a purely political question for the legislature to decide. If we may be permitted to draw analogies from party rules and proceedings prior to the enactment of the primary law, we may call attention to the well-known fact that representation in county and state conventions was then based upon a party census, sometimes taken in one manner and sometimes in another, the basis being in each case determined either by the preceding convention or by the party committee in calling the convention. Sometimes it was on the vote for presidential electors, four years prior to the election of delegates to a convention; sometimes on the vote for governor, and sometimes on an average of the votes for certain state offices, and at other times on the vote for candidates for Congress. The discretion formerly vested in the party management or party convention, of necessity is now vested in the legislature, and as long as it gives each party of the same class, that is, each party casting a certain number or percentage of votes, the same opportunity, I see no serious grounds for complaint. I know of no method which has been found, and can think of none which is likely to be devised, that will anything more than approximate absolute equality. This identical principle and question was argued before the supreme court of Wisconsin, after the argument was had in the case at bar. The opinion of that court has been handed down, sustaining the law of that state on this subject. It has not yet been published, but a copy has been before us for several weeks. The law in that state required a 20 per cent vote as compared with the vote for governor at the preceding general election. Judge Marshall wrote a most profound and exhaustive opinion on the subject, in the course of which it is held that the right to vote is not simply a privilege, as held by the courts of most states, and as I had supposed was the case, but that it is an inherent right under our state Constitutions, practically an inalienable right. If this be correct, it follows that the power of the legislature to regulate the exercise of the right to vote must be considerably restricted and limited, as compared with its power where the right is held to be only a privilege, thus making the conclusion of the Wisconsin court far more difficult to reach than had the right to

vote been held a privilege merely. It is held in that case that the validity of the law depends upon the answers to two questions: First, Is the purpose legitimate? second, Are the means employed to effect the purpose legitimate? And that if the purpose is legitimate and the means employed to effect the purpose reasonably adapted to that end, the law is entitled to judicial approval, and that court answers both questions in the affirmative. I should be pleased to quote extensively from that opinion, but the reasonable limits of this dissent, after what was said in the Anderson Case, renders it inadvisable and unnecessary. See State ex rel. McGrael v. Phelps, 144 Wis. 1, — L.R.A.(N.S.) —, 128 N. W. 1041.

The supreme court of Minnesota in State ex rel. Fitz v. Jensen, 86 Minn. 19, 89 N. W. 1126, passed upon a statute where the principle involved was identical with this, but the percentage was 10 per cent of the entire vote of the state, and the provision was held constitutional; and in concluding its opinion that court says: "We are of the opinion that the legislature may classify political parties with reference to differences in party conditions and numerical strength, and prescribe how each class shall select its candidates; but it cannot do so arbitrarily, and confer upon one class important privileges and partisan advantages, and deny them to another class, and hamper it with unfair and unnecessary burdens and restrictions in the selection of its candidates. While it seems to some of us that the percentage of the vote selected as the basis of the classification in this act is larger than necessary, yet it was a question for the legislature, and we are not justified in holding that the classification was arbitrary."

In Ledgerwood v. Pitts, 122 Tenn. 570, 125 S. W. 1036, a case decided in 1910, the supreme court of that state passed upon a provision that excluded from the benefits of the primary election law, political parties casting less than 10 per cent of the entire vote of the state at the preceding November general election, and held that such classification and exclusion was not unreasonable, arbitrary, capricious, or partial.

See also Ladd v. Holmes, 40 Or. 167, 91 Am. St. Rep. 457, 66 Pac. 714.

These are only a few of the many authorities which might be cited, sustaining the decision in the Anderson Case, and they conflict with

the opinion of the majority in the case at bar. But the principle which I contend for has recently been passed upon by this court in an opinion which met with the approval of each member who now joins in the majority opinion. In State ex rel. Hagendorf v. Blaisdell, supra, a question in every respect analogous to the one at bar was before us, and the law sustained. That case is cited by the Wisconsin court in State ex rel. McGrael v. Phelps, supra, as the latest pronouncement upon the question. I still think the decision in the Hagendorf Case sound, although in effect overruled by the majority opinion herein.

Chief Justice Marshall said many years ago: "Let the end be legitimate; let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited but consistent with the letter and spirit of the Constitution, are constitutional."

This principle must apply with far greater force to the powers of a legislature of a state, than those of Congress.

Another reason for affirming the judgment here appealed from is presented in respondent's brief. Under circumstances of this case, I express no opinion regarding this point, but must call attention to the principle and some authorities sustaining it. The principle is laid down, that where the statute has been held to be constitutional by the appellate court, the community has a right to expect with confidence that, in subsequent cases, the court will adhere to its former decision, made after full argument and upon due consideration; and by some courts this principle is emphasized where an attack is renewed after a change in the *personnel* of the court. Fisher v. Horicon Iron & Mfg. Co. 10 Wis. 355; Gibbons v. Ogden, 17 Johns. 488; Amoskeag Mfg. Co. v. Goodale, 62 N. H. 66; Stout v. Grant County, 107 Ind. 343, 8 N. E. 222. Mr. Justice White, now chief justice of the Supreme Court of the United States, discussed this subject, in Pollock v. Farmers' Loan & T. Co. 157 U. S. 608, 39 L. ed. 828, 15 Sup. Ct. Rep. 673, and I quote briefly from his opinion:

"A distinguished writer aptly points out the wrong which must result to society from a shifting judicial interpretation. He says:

"'If results and maxims of law were to ebb and flow with the taste of the judge, or to assume that shape which in his fancy best becomes

the times; if the decisions of one case were not to be ruled by, or depend at all upon, former determinations in other cases of a like nature, I should be glad to know what person would venture to purchase an estate without first having the judgment of a court of justice respecting the identical title which he means to purchase. No reliance could be had upon precedents; former resolutions upon titles of the same kind could afford him no assurance at all. Nay, even a decision of a court of justice upon the very identical title would be nothing more than a precarious temporary security; the principle upon which it was founded might in the course of a few years become antiquated; the same title might be again drawn into dispute; the taste and fashion of the times might be improved, and on that ground a future judge might hold himself at liberty (if not consider it his duty) to pay as little regard to the maxims and decisions of his predecessor as that predecessor did to the maxims and decisions of those who went before him.' Fearne, Contingent Remainders, London ed. 1801, p. 264.

"The disastrous consequence to flow from disregarding settled decisions thus cogently described must evidently become greatly magnified in a case like the present, when the opinion of the court affects fundamental principles of the government by denying an essential power of taxation long conceded to exist and often exerted by Congress. If it was necessary that the previous decisions of this court should be repudiated, the power to amend the Constitution existed, and should have been availed of . . . the conservation and orderly development of our institutions rest on our acceptance of the results of the past, and their use as lights to guide our steps in the future. Teach the lesson that settled principles may be overthrown at any time, and confusion and turmoil must ultimately result. In the discharge of its function of interpreting the Constitution, this court exercises an august power. It sits removed from the contentions of political parties and the animosities of factions. It seems to me that the accomplishment of its lofty mission can only be secured by the stability of its teachings and the sanctity which surrounds them. If the permanency of its conclusions is to depend upon the personal opinions of those who, from time to time, may make up its membership, it will inevitably become a theater of political strife, and its action will be without coherence or consistency. There is no great principle of our constitutional

law, such as the nature and extent of the commerce power, or the currency power, or other powers of the Federal government, which has not been ultimately defined by the adjudications of this court after long and earnest struggle. If we are to go back to the original sources of our political system, or are to appeal to the writings of the economists in order to unsettle all these great principles, everything is lost, and nothing saved to the people. The rights of every individual are guaranteed by the safeguards which have been thrown around them by our adjudications. If these are to be assailed and overthrown, as is the settled law of income taxation by this opinion, as I understand it, the rights of property, so far as the Federal Constitution is concerned, are of little worth. My strong convictions forbid that I take part in a conclusion which seems to me so full of peril to the country. I am unwilling to do so, without reference to the question of what my personal opinion upon the subject might be if the question were a new one, and was thus unaffected by the action of the framers, the history of the government, and the long line of decisions by this court. The wisdom of our forefathers in adopting a written Constitution has often been impeached upon the theory that the interpretation of a written instrument did not afford as complete protection to liberty as would be enjoined under a Constitution made up of the traditions of a free people. Writing, it has been said, does not insure greater stability than tradition does, while it destroys flexibility. The answer has always been that by the foresight of the fathers the construction of our written Constitution was ultimately confided to this body, which, from the nature of its judicial structure, could always be relied upon to act with perfect freedom from the influence of faction, and to preserve the benefits of consistent interpretation. The fundamental conception of a judicial body is that of one hedged about by precedents which are binding on the court, without regard to the personality of its members. Break down this belief in judicial continuity, and let it be felt that on great constitutional questions this court is to depart from the settled conclusions of its predecessors, and to determine them all according to the mere opinion of those who temporarily fill its bench, and our Constitution will, in my judgment, be bereft of value and become a most dangerous instrument to the rights and liberties of the people."

Seeing no sound reason for overruling the Anderson Case, I dissent.

Morgan, Ch. J., concurs fully in the foregoing dissent.