**STATE of North Dakota, Appellant,**

**v.**

**Gordon N. MILLER, Defendant and Respondent.**

**Cr. 320.**

Supreme Court of North Dakota.

July 1, 1964.

Helgi Johanneson, Atty. Gen., Bismarck, Vernon R. Pederson, Sp. Asst. Atty. Gen., Bismarck, and Richard B. Thomas, State's Atty., Minot, for appellant.

Joseph P. Stevens, Minot, for respondent.

ERICKSTAD, Judge.

This is an appeal by the State of North Dakota from an order of the district court which set aside the conviction of the defendant and ordered his discharge.

By a criminal information dated August 30, 1963, the defendant, Gordon N. Miller, was charged with having committed the crime of misrepresentation in an application for a hunting license, in violation of Section 20–03–35 of the North Dakota Century Code.

Said statute reads as follows:

"20–03–35. Making misrepresentation in application for, or alteration in license or permit unlawful—Penalty.— Any person who makes any misrepresentation in his application for a license or permit, or who makes any alteration in a license or permit already issued, is guilty of a misdemeanor and shall be punished by a fine of not less than fifty dollars nor more than one hundred dollars, or by imprisonment in the county jail for not less than twenty days nor more than thirty days, or by both such fine and imprisonment."

The pertinent parts of the information read as follows:

" * * * On the 8th day of August in the year of our Lord, One Thousand Nine Hundred and Sixty-Three, at the County of Ward, in said State of North Dakota, one Gordon N. Miller late of said County of Ward and State aforesaid, did commit the crime of Misrepresentation in Application for Hunting License. Committed as follows to-wit:

"That at the said time and place the said GORDON N. MILLER did make false representation in his application for hunting license in that he stated that he did not receive an antelope license for the year of 1959 in his Application for Special Resident Antelope License when in fact he had for the year of 1959, in violation of Section 20–03–35 of the North Dakota Century Code."

On September 17, 1963, the defendant was arraigned, entered a plea of not guilty, waived trial by jury, and asked that the trial be postponed until December. The proceedings were accordingly recessed. When the case was again called on February 11, 1964, counsel for the defendant objected to further proceedings, on the ground that Section 20–08–03 of the North Dakota Century Code was unconstitutional for the

reason that it did not treat all citizens and residents of North Dakota equally.

The statute in 1963 read as follows:

"20–08–03. Contents of Governor's Order or Proclamation Relating to the Taking of Game Birds, Fish, and Game Animals.) An order or proclamation issued by the governor pursuant to the provisions of this chapter shall prescribe, as to each species of game birds, fish, or game animals named therein, the following:

1. In what manner the same may be taken;

2. In what number the same may be taken and possessed and may limit such numbers by sex;

3. In what places the same may be taken; and

4. At what times the same may be taken and possessed.

The governor, in his order or proclamation, may provide for the number of big game permits or licenses to be issued for the taking of each species and the manner in which such permits or licenses shall be issued for the big game only. When a limited number of big game licenses are issued by lottery and the number of applicants is greater than the number of licenses to be issued, any applicant who is successful in obtaining such a license shall not be eligible to apply for a license to hunt the same species of big game for the four ensuing lottery years, except that owner operators or operators, living within the boundaries of the legal open area shall be entitled to purchase one such license for each farmstead unit in each consecutive season. By 1963 any person who has been an applicant for license in four successive lottery seasons and who shall not have been successful in any such lottery, shall be eligible to receive a license upon application there-for without having such application included in the lottery." N.Dak. Sess. Laws 1961, ch. 191. (The 1963 session of the Legislature amended the afore described statute to repeal the last sentence of the statute, the repeal to be effective July 1, 1964. N.Dak. Sess. Laws 1963, ch. 199.)

In overruling this objection the court indicated that the defendant could raise the constitutionality of the statute by a motion in arrest of judgment at the close of the case.

Upon trial of the case the court found the defendant guilty, but on submission of a written motion in arrest of judgment following said finding, the court set aside the conviction and discharged the defendant.

The material portion of the motion read as follows:

"1. That Section 20–08–03, NDCC, the Statute under which the application for a special permit was made, violates the provisions of Section 20, of the North Dakota Constitution, which provides in part 'Nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens.'

"2. That Section 20–08–03 excepts from its provisions 'Except that owner operators or operators, living within the boundaries of the legal open area shall be entitled to apply for one such license for each farmstead unit in each consecutive season.' That such exception is an unreasonable classification and confers privileges upon a class of citizens which it denies to the balance of the people of the State.

"3. That such classification is arbitrary and without any substantial relation to the general purpose of the Act. It is class legislation in favor of certain citizens and against the rest of the citizens of the State."

In deciding this motion, the court said:

"* * * The Court is persuaded to the view that the statute, pursuant to which the regulation was made providing for the lottery drawing, is unconstitutional, as a denial of equal privileges or immunities to the Defendant. Had an owner operator or operator residing within the area units open for hunting of antelope made an erroneous statement in his application for a permit, the erroneous statement would have been considered surplusage. The statute provides two discriminatory features. One, that the person who would qualify as an owner operator or operator within the unit could secure a hunting permit to hunt antelope each year; whereas, applicants not owner operators or operators within the hunting unit were restricted applications to the extent that they could not qualify for a permit if they had received an antelope permit in the previous four years. And, secondly, those not qualifying as owner operators or operators were relegated to the dubious privilege of taking a chance in a lottery to obtain their license or permit; whereas, the owner operators or operators in the area unit were not required to undergo any element of chance in procuring their permit. The imposition of the two qualifications upon those who were not owner operators or operators without imposing the same qualifications upon the owner operators or operators creates an unreasonable classification and discrimination not having any substantial relation to the purpose of the act, and accordingly the erroneous statement contained in the application becomes moot for all purposes; and under this view of the case the Defendant would have been entitled to his permit without undergoing any lottery device because he is entitled to the same privileges as the owner operator or operator, or whatever that term means.

"It is interesting to note that while the statute has seen fit to create many statutory definitions of terms in connection with the game and fish laws of the state, that 'owner operator' or 'operator' is nowhere defined in the statute, and this would apply to the operator of a small fur farm, the operator of a grocery store in the area or any other activity because the definition is lacking. The Court would observe further, in interpreting the statute, that such a definition creates an uncertainty in the act making it so indefinite and uncertain that the statute itself would be void from uncertainty; and considering all of these reasons, the Court would hold that the making of the application under the circumstances does not constitute a criminal offense."

Before we analyze the specific constitutional questions in this case, a review of basic principles which apply in considering the constitutionality of a statute is in order. In a decision rendered in 1915 this court said:

"* * * It is a well-settled principle of constitutional law that a law enacted by the Legislature is presumed to be constitutional, unless it is shown that it is manifestly violative of the organic law. And the courts will construe statutes so as to harmonize their provisions with the Constitution if it is possible to do so, to the end that they may be sustained. 8 Cyc. 801–803; Black's Constitutional Law, p. 58; State v. Ure, 91 Neb. 31, 135 N.W. 224. * * *

* * * * * *

"Every presumption is in favor of the propriety and constitutionality of legislation, and improper motives in its enactment are never imputed to the Legislature. * * *" O'Laughlin v. Carlson, 30 N.D. 213, 152 N.W. 675.

Later, in a decision written by the same author, this court said:

" * * * And 'the courts invariably give the most careful consideration to questions involving the interpretation and application of the Constitution, and approach constitutional questions with great deliberation, exercising their power in this respect with the greatest possible caution, and even reluctance, and they should never declare a statute void, unless its invalidity is, in their judgment, beyond reasonable doubt.' 6 R.C.L. pp. 74, 75. In other words, the question for the court to determine is not merely whether the statute is in conflict with the Constitution, but whether it is within the limits of reason for the Legislature to give to the Constitution the construction it has given to it in enacting the statute. 1 Willoughby on Const. p. 21.

" * * * In State ex rel. Linde v. Taylor, 33 N.D. 76, 85, 86, 156 N.W. 561, 564 (L.R.A.1918B, 156, Ann.Cas. 1918A, 583), this court said:

" 'Every reasonable presumption is in favor of the constitutionality of a statute enacted by the Legislature. 8 Cyc. 801; O'Laughlin v. Carlson, 30 N.D. 213, 152 N.W. 675. This presumption is conclusive, unless it is clearly shown that the enactment is prohibited by the Constitution of the state or of the United States. Cooley, Const.Lim. (7th Ed.) 242; 8 Cyc. 801. The only test of the validity of an act regularly passed by a state Legislature is whether it violates any of the express or implied restrictions of the state or federal Constitution. 8 Cyc. 776; Cooley, Const.Lim. (7th Ed.) pp. 232–241; Re Watson, 17 S.D. 486, 97 N.W. 463, 2 Ann.Cas. 321; Ratcliff v. Wichita Union Stockyards Co., 74 Kan. 1, 6 L.R.A. (N.S.) 834, 118 Am.St.Rep. 298, 86 Pac. 150; 10 Ann.Cas. 1016; State ex rel. Nichols v. Cherry, 22 Utah, 1, 60 Pac. 1103; Ex parte Boyce, 27 Nev. 299, 65 L.R.A. 47, 75 Pac. 1, 1 Ann.Cas. 66. And he who alleges a statute to be unconstitutional must be able to point to the particular constitutional provision violated. Missouri River Power Co. v. Steele, 32 Mont. 433, 80 Pac. 1093; State v. Wilson, 124 Iowa, 264, 99 N.W. 1060; 8 Cyc. 800.'

"These rules are peculiarly applicable in this state, where it is provided by the Constitution 'that in no case shall any legislative enactment or law of the state of North Dakota be declared unconstitutional' unless four of the five judges of the Supreme Court shall so decide. N.D.Const. art. 25, Amendments.

"In considering whether the Legislature transcended its constitutional powers in the enactment of a statute it is also well to bear in mind the fundamental difference between the Constitution of the United States and the Constitution of the state of North Dakota, as regards the legislative powers which may be exercised under them. Cooley (Cooley, Const.Lim. [7th Ed.] 242) said:

" 'We look in the Constitution of the United States for grants of legislative power, but in the Constitution of the state to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the state was vested in its creation. Congress can pass no laws but such as the Constitution authorizes, either expressly or by clear implication; while the state Legislature has jurisdiction of all subjects on which its legislation is not prohibited. The law-making power of the state, it is said in one case, recognizes no restraints, and is bound by none except such as are imposed by the Constitution. That instrument has been aptly termed a legislative act by the people themselves in their sovereign capacity,

and is therefore the paramount law. Its object is not to grant legislative power, but to confine and restrain it. Without the constitutional limitations the power to make laws would be absolute. These limitations are created and imposed by express words or arise by necessary implication.'

"* * * Under the Constitution of this state 'all governmental sovereign power is vested in the Legislature, except such as is granted to the other departments of the government, or expressly withheld from the Legislature by constitutional restrictions.' State ex rel. Standish v. Boucher, 3 N.D. 389, 396, 56 N.W. 142, 144 (21 L.R.A. 539); O'Laughlin v. Carlson, 30 N.D. 213, 152 N.W. 675; State ex rel. Linde v. Taylor, supra." State v. First State Bank, 52 N.D. 231, 202 N.W. 391, at 396.

In the instant case the State's basic contention is that the district court erred in concluding that Section 20-08-03 of the North Dakota Century Code is unconstitutional because it creates an arbitrary classification, contrary to Section 20 of the North Dakota Constitution.

"No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens." N.D.Const. art. I, sec. 20.

This court on numerous occasions has held that Section 20 of our constitution does not prohibit the Legislature from making classifications, providing the classifications are reasonable.

"This court, in discussing the provisions of the North Dakota Constitution in the case of State ex rel. Dorval v. Hamilton, 20 N.D. 592, 129 N.W. 916, 918, said: 'It is doubtless true that, notwithstanding constitutional inhibitions such as those contained in sections 11 and 20, the Legislature may provide a certain classification of citizens to be differently affected by the same general rule. The limitation imposed upon legislation of this character, is, however, that any classification provided as the basis for distinctive or special operation of the law must be natural, not artificial. "It must stand on some reason having regard to the character of the legislation." Edmonds v. Herbrandson, 2 N.D. 270, 50 N.W. 970, 14 L.R.A. 725. "It must rest on some difference which has a reasonable and just relation to the act in respect to which the classification is proposed." "It is not necessary that the law shall operate on all alike, but * * it must operate alike on all who are in like situation. The law need not have a universal operation, but must be uniform. Proper classification is permitted, but arbitrary and unreasonable discrimination is forbidden." Beleal v. Northern P. R. Co., 15 N.D. 318, 108 N.W. 33 [11 Ann.Cas. 921]. "It must rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis." Gulf, C. & S. F. R. Co. v. Ellis, 165 U.S. 150, 155, 17 S.Ct. 255, 41 L.Ed. 666, 668; Powers Elevator Co. v. Pottner, 16 N.D. 359, 113 N.W. 703.'" Figenskau v. McCoy, 66 N.D. 290, 265 N.W. 259, at 262.

In the case of Figenskau v. McCoy, supra, this court was considering a statute wherein the Legislature defined commercial freighting to mean the carriage of things other than passengers for hire, which statute provided further:

"* * * that commercial freighting as defined in this act shall include any individual, copartnership, company or corporation, their lessees, trustees, receivers or trustees appointed by any

court whatsoever, operating over the highways of the state in transporting goods, from one point to another for themselves or others where the price of said merchandise at its point of destination includes the cost of transportation or when a separate charge is made for said transportation."

The statute contained a number of exceptions, some of which, it was contended, rendered the statute unconstitutional.

The court first considered an exemption which provided that commercial freighting "shall not include hauling done for farmers in transporting agricultural products to or from market, nor shall this include anyone hauling farm products to or from a railroad station in his farming territory. * *" N.Dak.Sess.Laws 1935, ch. 181, sec. 1.

In finding this provision constitutional, the court said:

"It is a matter of common knowledge that under the present transportation and marketing system the cost of transportation of agricultural products from the farm to the market or to the railway station usually falls upon the farmer. He has no way of including the cost of transportation in the price which he receives for his products and thus passing it on to the purchaser. The cost of transportation is one of the handicaps of the farming industry in this state. The Legislature may have reasonably decided that, since the fee here considered adds to the cost of transportation between farm and market or at least between the farm and the railroad station, it should not impose a further transportaion burden upon agricultural products. When considered in this light, the exemption is based upon a reasonable and distinguishable classification, and is not in conflict with the provisions of either the state or federal Constitutions. Nance v. Harrison, 176 Ga. 674, 169 S.E. 22; Aero Mayflower Transit Company v. Georgia Public Service Commission, 179 Ga.

431, 176 S.E. 487; Id., 295 U.S. 285, 55 S.Ct. 709, 79 L.Ed. 1439; State v. Public Service Commission, 207 Wis. 664, 242 N.W. 668. See, also, State v. LeFebvre, 174 Minn. 248, 219 N.W. 167." Figenskau v. McCoy, supra, 66 N.D. 290, 265 N.W. 259, at 263.

The next exemption provided: "This act shall not apply to retailers engaged in delivering only gas and gas products from the bulk station directly to the farmer." In considering this exemption, the court said:

"* * * No reasonable distinction can be made between the retailer engaged in delivering gas and gas products to the farmer directly from a bulk station and a retailer who delivers the same products from elsewhere. No such distinction can be made between a retailer who delivers such products from a bulk station and some one other than a retailer who delivers such products from a bulk station. There is no reasonable distinction between a retailer who delivers such products from a bulk station to a farmer and a retailer who delivers the same products over the same roads for the same use or purpose to one who is not a farmer. There appears to be no distinction between a retailer delivering gas and gas products to a farmer and another retailer delivering household necessaries, clothing, or lignite coal. The classification set up by this exemption is purely arbitrary." Figenskau v. McCoy, supra, 66 N.D. 290, 265 N.W. 259, at 264.

█ This court will take judicial notice of such matters of common knowledge and science as may be known to all men of ordinary understanding and intelligence. N.D.C.C. Sec. 31–10–02(84).

█ It will also take judicial notice of such contemporaneous history as led up to and probably induced the passage of a law. N.D.C.C. Sec. 31–10–02(77).

That big game, especially the pronghorn or antelope, was in danger of becoming

extinct and, to survive, needed protective legislation, was obvious as early as 1898:

"PRONGHORN—The prongbuck (*Antilocapra americana*) is almost universally known in America as 'antelope'; yet it is, in reality, not an antelope at all, but a very peculiar beast which zoologically stands in a position as unique as that of the giraffe, being the only hollow-horned ruminant which annually sheds its horns.

"Pronghorns were formerly found all over the great plains of western North America from the Mississippi to the Pacific, and from Northern Mexico to the Saskatchewan. Like all other big game, their numbers have been very much reduced. They hold their own, of course, far better than great beasts like the bison and wapiti, where the conditions are similar: in many places where all three were formerly abundant the pronghorn is now the only survivor, though sadly thinned in numbers. But he is, when left to himself, purely a beast of the prairie and the open plains, and like all such beasts he vanishes far more quickly than those that dwell in the shelter of the tangled forests; the white-tail deer always outlasts him." Theodore Roosevelt, Pronghorn, in II The Encyclopaedia of Sport 137 (1898).

In the instant case there is no contention that the Legislature lacked authority generally to enact legislation for the protection of big game.

The contention is, rather, that the legislation violates the constitution of the State in that it grants privileges and immunities to a class of citizens designated as "owner operators" and "operators" that it does not grant to the defendant, and that for this reason it is unconstitutional.

■ As we have seen, merely because a statute distinguishes between citizens or classes of citizens does not make it unconstitutional. If a classification is reasonably necessary to effect the purposes of a law which is otherwise within the province of the Legislature to enact, the classification will not render the law repugnant to the Constitution.

■■ This statute must be considered in light of the great and urgent need of legislation for protection and conservation of our big game and in light of the important part that our farmers and ranchers have in protecting and preserving the game. The Legislature could very reasonably have found that big game could not be preserved and conserved without the cooperation of those upon whose lands the game found its food and shelter and reared its young. The privilege of receiving an annual big game license accorded the owner operators or operators of the farmstead units residing within the legal open areas where the game lives was undoubtedly intended as an inducement to farm and ranch operators to cooperate in the preservation and conservation of the game for the benefit of all the people of the state. This can hardly be said to be an arbitrary classification or one discriminatory to the defendant. As conservation practices necessitated the restriction of the big game harvest each year, it was not unreasonable for the Legislature to grant the operators a preferred status in receiving big game licenses.

The contention that the statute fails for indefiniteness will now be considered.

■ As neither the defendant nor the State has placed sufficient importance on this contention to support it with argument or authority in written brief or in oral argument in this court, and as the trial court merely referred to it casually, as noted, we deem it a contention of lesser importance.

"The practical inquiry in litigation is usually to determine what a particular provision, clause, or word means. To answer it one must proceed as he would with any other composition—construe it with reference to the lead-

ing idea or purpose of the whole instrument. A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole. Thus it is not proper to confine interpretation to the one section to be construed.

" 'It is always an unsafe way of construing a statute or contract to divide it by a process of etymological dissection, and to separate words and then apply to each, thus separated from its context, some particular definition given by lexicographers and then reconstruct the instrument upon the basis of these definitions. An instrument must always be construed as a whole, and the particular meaning to be attached to any word or phrase is usually to be ascribed from the context, the nature of the subject matter treated of, and the purpose or intention of the parties who executed the contract or of the body which enacted or framed the statute or constitution.' [International Trust Co. v. American Loan & Trust Co., 62 Minn. 501, 65 N.W. 78, 632 (1895).]" 2 Sutherland, Statutes and Statutory Construction Sec. 4703 (3d ed. Horack 1943).

In the instant case it is enough to say that the meaning of the terms "owner operators" and "operators," although not specifically defined in the statute, is clear when read in the context of the entire statute. Only the resident operators of farmstead units of such type or nature as provides the habitat for big game are eligible for the license preference. Any other construction would make the classification unreasonable and arbitrary. The statute therefore does not fail for reason of indefiniteness.

The judgment of the district court setting aside the conviction and discharging the defendant is therefore reversed, with instructions that the district court render judgment in conformity with this opinion.

MORRIS, C. J., and BURKE and TEIGEN, JJ., concur.

STRUTZ, J., did not participate.