HOSPITAL SERVICES, INC., a corpora-
tion, Plaintiff and Appellant,

v.

George BROOKS, Defendant
and Appellee.

Civ. No. 9068.

Supreme Court of North Dakota.

April 2, 1975.

Robert A. Alphson, Grand Forks, for plaintiff and appellant.

DePuy, Fair & O'Connor, Ltd., Grafton, for defendant and appellee; argued by E. N. O'Connor, Grafton.

ERICKSTAD, Chief Justice.

This action was brought by the appellant, Hospital Services, Inc., an assignee of the State Hospital at Jamestown, North Dakota, to recover upon an account for supplies and services provided to the appellee's mother, Agnes Brooks. The district court, finding Section 25–09–04, N.D.C.C., unconstitutional, ruled in favor of the defendant, appellee, George Brooks.

The parties have stipulated to the following facts.

Agnes Brooks, born April 23, 1906, was committed to the State Hospital at Jamestown, North Dakota, through the Walsh County Court. She remained a patient at that institution from May 21, 1965, until September 2, 1969, during which time the Hospital performed services for and furnished supplies to her of the reasonable value of $8,708.46. Mrs. Brooks is a widow and now a resident of the Pembelier Nursing Center at Walhalla, North Dakota. While no legal action has been commenced against her for collection of the account, demand for payment has been made upon George Brooks, one of her five sons. He refused to make payment and on January 27, 1972, the State Hospital claim was assigned to Hospital Services, Inc., which commenced an action against Mr. Brooks.

As framed by the parties, the issue before this Court is whether Section 25–09–04 of the North Dakota Century Code violates the provisions of Section 11 and Section 20 of Article I of the Constitution of the State of North Dakota and Article XIV, Section 1, of the United States Constitution.

Previous to its amendment in 1971, Section 25–09–04, N.D.C.C., read:

"25–09–04. Responsible relatives shall pay for care and treatment—Definition. —In the event of the patients' inability to pay for the costs of care and treatment, responsible relatives of such patients at the state hospital or state school shall pay to the supervising department quarterly, the actual cost of care and treatment incurred by the state at each institution, or such lesser amount as may be determined in accordance with sections 25–09–05, 25–09–06, or 25–09–11. For purposes of this chapter and title 25 of this code 'responsible relatives' shall mean the patient's spouse, father, mother or children." N.D.C.C.

Pertinent sections of the Constitution of the State of North Dakota read:

"Section 11. All laws of a general nature shall have a uniform operation."

Article I, Constitution of the State of North Dakota.

"Section 20. No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens."

Article I, Constitution of the State of North Dakota.

Pertinent also is Article XIV, Section 1, of the United States Constitution.

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article XIV, United States Constitution.

Preliminary to any consideration of constitutional questions, we will examine Brooks' contention that the judgment dismissing the complaint can be affirmed on nonconstitutional grounds.

■ He first contends that in amending Section 25–09–04, N.D.C.C., in 1971, the Legislature intended only a clarification of the prior statute and did not intend to alter its operation. Brooks asserts that because the amended statute now excludes children from the list of "responsible relatives," the judgment should be affirmed on the basis of Section 25–09–04, N.D.C.C., as amended. That section now reads:

"25–09–04. Responsible relatives shall pay for care and treatment—Definition. —In the event of a patient's inability to pay for the costs of care and treatment, responsible relatives of such patient at the state hospital or state school shall pay to the supervising department monthly, the actual cost of care and treatment incurred by the state at each institution, or such lesser amount as may be determined by law. For purposes of this chapter and title 25, 'responsible relatives' shall mean the patient's spouse, father, or mother. No responsible relative shall be required to pay such costs for children upon such children reaching their eighteenth birthday in regard to indebtedness

incurred from and after July 1, 1971." N.D.C.C.

To uphold Brooks' contention we would have to give retrospective effect to the amendment in 1971 of Section 25–09–04, N.D.C.C. Giving retrospective effect to this section would contravene a statute and decisions of this State.

Section 1–02–10, N.D.C.C., provides that "no part of this code is retroactive unless it is expressly declared to be so."

In Monson v. Nelson, 145 N.W.2d 892, 897 (N.D.1966), we said:

"The general rule of statutory construction that an act of the legislature is presumed to be prospective unless the legislature clearly manifests a contrary intention is well established in this state by case law and statute. See Gimble v. Montana-Dakota Utilities Co., 77 N.D. 581, 44 N.W.2d 198, and cases cited."

For these reasons we conclude that the judgment cannot be affirmed on the basis that Section 25–09–04, N.D.C.C., as amended in 1971, is in effect for this case.

■■ Brooks also contends that legal action by the State Hospital against the patient to recover the amount due is a condition precedent to bringing action against a responsible relative as described in Section 25–09–04, N.D.C.C. because of our views concerning the constitutional issue, we shall not attempt to determine the validity of this contention.

Questions, the answers to which are not necessary to the determination of a case, need not be considered. See Stockmen's Ins. Agcy., Inc. v. Guarantee Res. L. Ins. Co., 217 N.W.2d 455 (N.D.1974); Inches v. Butcher, 104 N.W.2d 556 (N.D.1960); Heald v. Strong, 24 N.D. 120, 138 N.W. 1114 (1912).

■ The statute before us constitutes class legislation in that it imposes upon some persons a financial burden related to a state function which is not imposed upon other persons. The question is whether it constitutes impermissible classification or

invidious discrimination. Classification is not in itself prohibited. However, in classifying to achieve social goals, the Legislature may not act arbitrarily.

We have said in considering the constitutionality of a statute which distinguished between State legislators who rendered services or did business with the State or its subdivisions, depending on whether they rendered services or did business in excess of or less than $10,000 in any calendar year, and in considering the constitutionality of a statute dealing with the right of an illegitimate child to receive an inheritance, that:

"5. Sections 11 and 20 of the North Dakota Constitution and § 1 of the fourteenth amendment to the United States Constitution do not prohibit or prevent classification, provided such classification is reasonable for the purpose of legislation, is based on proper and justifiable distinctions considering the purpose of the law, is not clearly arbitrary, and is not a subterfuge to shield one class or to burden another or to oppress unlawfully in its administration.

"6. A proper classification for legislative purposes must embrace all who naturally belong to the class." In Re Estate of Jensen, 162 N.W.2d 861, 877 (N.D. 1968).

See also Melland v. Johanneson, 160 N.W.2d 107 (N.D.1968).

■■ We believe that the classification inherent in Section 25–09–04, N.D.C.C., is arbitrary and oppressive, that there exists no reasonable relationship between the legislative purpose, that of reducing the financial burden upon the State of caring for those who have been involuntarily committed to the State Hospital for the mentally ill, and the selection of the class of "responsible relatives" designated in that section to accomplish that purpose and that this section therefore denies that equal protection of the laws that is guaranteed under Sections 11 and 20 of our State Constitution. For reasons later explained, we decline to decide whether that section is violative of

Section 1 of the Fourteenth Amendment to the United States Constitution. In finding Section 25–09–04 unconstitutional, we reach the same result as the Supreme Court of California in Department of Mental Hygiene v. Kirchner, 60 Cal.2d 716, 36 Cal. Rptr. 488, 388 P.2d 720 (1964).

The facts before us closely parallel those in that case. In *Kirchner*, a Mrs. Schaeche was adjudged mentally ill and committed by the Court to a State institution for the care of the mentally ill. The Department of Mental Hygiene filed against her deceased daughter's estate, a creditor's claim for the amount due for the care and maintenance rendered Mrs. Schaeche at Agnews State Hospital. The claim was rejected by the defendant administratrix.

In support of a judgment in its favor, the Department of Mental Hygiene relied upon the declaration in Section 6650 of the California Welfare and Institutions Code that "the husband, wife, father, mother, or children of a mentally ill person or inebriate * * * shall be liable for his care, support, and maintenance in a state institution of which he is an inmate. * * *"

The Supreme Court of California held in *Kirchner* that Section 6650 violated the constitutional guarantee of equal protection of the laws and was therefore unconstitutional. The Court quoted from Department of Mental Hygiene v. Hawley, 59 Cal.2d 247, 28 Cal.Rptr. 718, 379 P.2d 22 (1963), wherein it held that recovery could not constitutionally be had from a father by the Department of Mental Hygiene for the cost of care, support, and maintenance of a son in a State hospital for the mentally ill or insane when the son was committed incidental to an alleged violation of a penal statute.

" "The enactment and administration of laws providing for sequestration and treatment of persons in appropriate state institutions—subject of course, to the constitutional guaranties—who would endanger themselves or others if at large is a proper state function; being so, it follows that the expense of providing, operating and maintaining such institutions

should (subject to reasonable exceptions *against the inmate or his estate*) be borne by the state.'" Department of Mental Hygiene v. Kirchner, 60 Cal.2d 716, 36 Cal.Rptr. 488, 490, 388 P.2d 720, 722 (1964). [Emphasis in quoted material.]

The Court further said:

"Whether the commitment is incidental to an alleged violation of a penal statute, as in *Hawley,* or is essentially a civil commitment as in the instant case, the purposes of confinement and treatment or care in either case encompass the protection of society from the confined person, and his own protection and possible reclamation as a productive member of the body politic. Hence the cost of maintaining the state institution, including provision of adequate care for its inmates, cannot be arbitrarily charged to one class in the society; such assessment violates the equal protection clause." Department of Mental Hygiene v. Kirchner, 60 Cal.2d 716, 36 Cal.Rptr. 488, 490, 388 P.2d 720, 722 (1964).

On appeal to the Supreme Court of the United States, *Kirchner* was remanded to determine whether the support statute in question was held unconstitutional by reason of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States or the equivalent provisions of the California Constitution. Department of Mental Hygiene of California v. Kirchner, 380 U.S. 194, 85 S.Ct. 871, 13 L.Ed.2d 753 (1965).

On remand, the Supreme Court of California affirmed its previous decision saying:

"Inasmuch as we did not act solely by compulsion of the Fourteenth Amendment, either directly or in construing or in applying state law, we reiterate our former decision as filed January 30, 1964, reported at 60 Cal.2d 716, 36 Cal.Rptr. 488, 388 P.2d 720." Department of Mental Hygiene v. Kirchner, 62 Cal.2d 586, 43 Cal.Rptr. 329, 330, 400 P.2d 321, 322 (1965).

We are not unmindful of the five-to-two decision written by Justice Sullivan and rendered by the Supreme Court of California after four of the seven judges who joined in *Kirchner* left the Court. See Swoap v. Superior court of Sacramento County, 10 Cal.3d 490, 111 Cal.Rptr. 136, 516 P.2d 840 (1973).

In *Swoap,* two recipients of aid to the aged and their adult children brought a class action seeking to enjoin the California State officials from requiring adult children to reimburse the State pursuant to Sections 12100 and 12101 of the Welfare and Institutions Code of the State of California for aid to the aged extended to their parents. Section 12100 provided that the county granting aid to the aged might proceed against the adult child of a recipient to collect the amount due under Section 12101.

Section 206 of the Civil Code, prior to its 1971 amendment, in part read:

" 'It is the duty of the father, the mother, and the children of any *poor* person who is unable to maintain himself by work, to maintain such person to the extent of their ability. . . .' " Swoap v. Superior Court of Sacramento County, 10 Cal.3d 490, 111 Cal.Rptr. 136, 139, 516 P.2d 840, 843 n. 4 (1973). [Emphasis in quoted material.]

The California Court stated the issue and its conclusion in *Swoap* in the following words:

"Therefore, the real question which *Kirchner* raises in the instant case is whether the class of adult children in *general* are otherwise under a duty to support needy or poor parents which duty provides a rational basis for upholding the relatives' responsibility created by sections 12100 and 12101 against the challenge that such statutes are impermissibly discriminating. We answer this question in the affirmative." Swoap v. Superior Court of Sacramento County, 10 Cal.3d 490, 111 Cal.Rptr. 136, 144, 516 P.2d 840, 848 (1973). [Emphasis in original.]

Referring to Sections 12100 and 12101 of the Welfare and Institutions Code and Section 206 of the Civil Code, the Court said:

"Since these sections do not touch upon a fundamental interest and do not create any suspect classifications, their constitutionality is to be determined by the normal 'rational relationship' test, namely by ' "requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivably legitimate state purpose." ' (Serrano v. Priest, *supra*, 5 Cal.3d [584] at p. 597, 96 Cal.Rptr. [601] at p. 609, 487 P.2d [1241] at p. 1249.)

"As indicated earlier, we recognized in *Boss* [3 Cal.3d 962, 92 Cal.Rptr. 294, 479 P.2d 654] that the state purpose of the relatives' responsibility statutes is to 'relieve the public treasury of part of the burden cast upon it by the public assumption of responsibility to maintain the destitute.' It is uncontested that this is a legitimate state purpose. (Bullock v. Carter (1972), 405 U.S. 134, 147, 92 S.Ct. 849, 31 L.Ed.2d 92.) The sole question therefore is whether placing the burden for this support upon the adult children bears some rational relationship to the accomplishment of the state purpose of relieving the public treasury.

"It seems eminently clear that the selection of the adult children is rational on the ground that the parents, who are now in need, supported and cared for their children during their minority and that such children should in return now support their parents to the extent to which they are capable. Since these children received special benefits from the class of 'parents in need,' it is entirely rational that the children bear a special burden with respect to that class." Swoap v. Superior Court of Sacramento County, 10 Cal.3d 490, 111 Cal.Rptr. 136, 147, 516 P.2d 840, 851 (1973).

In upholding the statutes against the attack that they denied equal protection of the laws, the Court said:

"The provisions of the Old Age Security Law (§§ 12100 and 12101) requiring adult children to contribute to the support of their parents do not thereby arbitrarily charge to one class in society the cost of public assistance to the aged who are poor or in need. A rational basis for such classification is found in, and provided by, Civil Code section 206, which itself rests soundly on our Anglo-American legal tradition. Accordingly the liability imposed by the Old Age Security Law on responsible relatives does not deny them the equal protection of the laws. * * *" Swoap v. Superior Court of Sacramento County, 10 Cal.3d 490, 111 Cal.Rptr. 136, 148, 516 P.2d 840, 852 (1973).

It should be noted that a vigorous dissent was written by Justice Tobriner which was joined in by Justice Mosk in which it was asserted that the majority of the Court in *Swoap* effectively overruled the previous unanimous decision of the Court in *Kirchner*. A part of that dissent follows:

"The majority have uprooted cases deep in the subsoil of our law. The tragedy lies in the fact that those cases were the product of the courts' sensitive accommodation of constitutional principle to social reality. Thus the majority have turned back the pages of judicial history and restored the inequitable requirement that some of the poor support others of the poor; the majority defend again the arbitrary selection of a private group to bear a public burden; the majority disregard the constitutional injunction against the denial of the equal protection of the laws." Swoap v. Superior Court of Sacramento County, 10 Cal.3d 490, 111 Cal. Rptr. 136, 160, 516 P.2d 840 at 864, 865 (1973).

We think that an earlier part of the dissent is significant.

"Moreover, the classification scheme created by the relative responsibility provision is doubly invidious because, as a practical matter, in the great majority of cases the adult children of 'parents in need' themselves command only very

modest incomes. Technically, of course, it is true that, as the majority point out, the challenged provisions apply to *all* children of poor parents, whether the children be rich or poor. We blind ourselves to reality, however, if we do not recognize that by and large poor parents have less-than-wealthy adult children, adult children who, more often than not, are beginning to raise their own families and attempting to improve their economic condition. It is this class of citizens that the challenged provisions single out to bear an additional burden, a burden which is imposed not because of any personal failing of the adult child, but simply because his parent happens to be poor. Thus, in addition to all the disadvantages poverty may earlier have cast on this class of citizens, these adult children are required once again to bear an increased burden simply because their family is poor.

"The disproportionate burden which relative responsibility laws place on the poor is not a contemporary phenomenon. As Professor ten Broeck extensively demonstrates in his exhaustive study of the development of California family law, from the time of the Elizabethan Poor Laws the Anglo-Saxon legal system has incorporated a dual system of family law, one applicable to the poor and the other to the rest of society. 'The . . . basis of the overall classification—the family law of the poor—and the source of its distinction from the family law of the rest of the community is that the families who are its subjects are poor. *It is this basic fact, the poverty of the class of persons entitled to assistance under the state's welfare laws, which underlies the further and altogether dependent classification of certain relatives of such persons as responsible.* One classification based on poverty is thus built upon another, and the whole system is accordingly doubly invidious.' (Emphasis added.) (ten Broeck, California's Dual System of Family Law: Its Origin, Development and Present State, Part III (1965) 17 Stan.L. Rev. 614, 644.)" Swoap v. Superior Court of Sacramento County, 10 Cal.3d 490, 111 Cal.Rptr. 136, 159, 516 P.2d 840, 863 (1973).

Apart from the unfairness asserted by the dissent in *Swoap* in this type of legislation, there are features of Section 25–09–04, N.D.C.C., which make it unfair and result in invidious discrimination. The statute does not require that the State agency first seek to recover for the cost of the care of the patient at the State Hospital from the patient or from the patient's estate, nor does it give the relative burdened with this responsibility the right of subrogation in conjunction with any effort that relative might want to make to secure recoupment from other relatives or from the estate of the patient upon the patient's death.

Perhaps of no legal significance, but a matter of some practical significance, is the fact that the Legislature has now seen fit to amend the law to relieve adult children from this responsibility. In light of the change in the law, it would not be surprising if those required by the former law to pay the costs of their parents in the State Hospital might not believe themselves unfairly treated if other adult children were excused from that responsibility on the basis that the latter's parents were committed to the institution subsequent to the change in the law. We think that it is vital to the preservation of our system of government that our people not only obey our laws but that they believe that the laws are basically fair and just and that the laws treat people equally.

Without concurring in all that is said in *Kirchner* and without adopting the view of the dissent in *Swoap*, we conclude that Section 25–09–04, N.D.C.C., as it relates to the responsibility of children to pay for their parents' care at the State Hospital, which care results from an involuntary commitment, is a denial of the equal protection of the laws and unconstitutional as a violation of Sections 11 and 20 of the North Dakota State Constitution.

In accord with our decision in Johnson v. Hassett, 217 N.W.2d 771 at 780 (N.D.1974), where we held the guest law unconstitutional as a violation of Sections 11 and 20 of our State Constitution but declined to determine whether it violated the Fourteenth Amendment of the United States Constitution, we conclude that Section 25–09–04, N.D.C.C., as it existed prior to the 1971 amendment violates Sections 11 and 20 of our State Constitution and decline to decide whether it violates the Fourteenth Amendment of the United States Constitution. The conclusions reached herein do not apply to Section 25–09–04, N.D.C.C., as amended and reenacted by Chapter 275 of the 1971 Session Laws, and as amended and reenacted by Chapter 230 of the 1973 Session Laws.

The judgment of the trial court is affirmed.

VOGEL, SAND and PAULSON, JJ., concur.

PEDERSON, Judge (dissenting).

I respectfully dissent.

In this case the trial court made no finding of fact nor conclusion of law that § 25–09–04, N.D.C.C., or any part thereof, was violative of the North Dakota Constitution. Accordingly, the judgment did not hold the statute unconstitutional. We are apparently asked to assume such finding, conclusion, or judgment.

The record does not show that the Attorney General was served and afforded an opportunity to appear as required by § 32–23–11, N.D.C.C., when a statute is alleged to be unconstitutional. However, counsel for Hospital Services, Inc., stated orally that he has an appointment as a Special Assistant Attorney General and, in that capacity, has an understanding with the Attorney General that he will represent the State when such issues arise. This hardly suffices to fulfill an obvious intent that the State has a separate and independent interest to protect when legislative enactments are challenged as to validity.

Legislative enactments are entitled to every presumption of constitutionality and such presumption should prevail unless it is shown that it is manifestly violative of organic law. The challenger has the burden of proving that the statute does not apply uniformly within a class of persons or that the class is based upon an unreasonable distinction or that it is an unnatural classification. F. W. Woolworth Co. v. Gray, 77 N.D. 757, 46 N.W.2d 295 (1951); Asbury Hospital v. Cass County, 72 N.D. 359, 7 N.W.2d 438 (1943). It appears to me that the trial court, and the majority opinion, places the burden on the appellant, rather than giving him the benefit of the presumption.

"The justice, wisdom, necessity, utility or expediency of a law which is within their powers are for the lawmakers." Asbury Hospital, *supra,* at 454. Even though we might disagree with the moral principle involved, a classification based upon a moral principle is not legally invalid.

If the relationship is so unique between a farmer and antelope which might feed on his crops so as to justify putting such farmer in a hunting-license class distinct from all other persons, as this court held in State v. Miller, 129 N.W.2d 356 (N.D.1964), I see no problem in finding the necessary uniqueness in the relationship between a mother and her adult son to warrant putting that son in a class distinct from all other persons for the purpose of determining responsibility for care of his mother in a state institution.

If that part of § 25–09–04, which was amended out by the 1971 Legislative Assembly, is invalid because a parent-child relationship is not adequate to support a classification based wholly on that relationship, then the remainder of § 25–09–04, and those provisions in Chapter 14–09, N.D.C.C., which base certain legal obligations upon parent-child or husband-wife relationships, all are doomed.

Although the majority opinion states that it does not rely entirely on the California

holdings in *Kirchner* and *Swoap* (cited in the majority opinion) which appear to say that California has adopted a complete social welfare approach toward those committed to state institutions, neither does the majority rely upon the holding of any other court, all of which holdings are contrary to the majority opinion.

I am not persuaded by the showing in this case nor by the obfuscated precedents of the California holdings. The reasoning in State, Rev. Div. of Dept. of Tr. v. Estate of Raseman, 18 Mich.App. 91, 170 N.W.2d 503 (1969), is logical and convincing, and expresses my view.

When the majority tries to limit its holding to cases where there is an "involuntary commitment," it assumes a fact which is not clearly supported by the record. The record discloses that the commitment was handled by the county court. The records of that commitment are not before us. We are not told that the appellee did not institute the commitment proceedings.

Appellee has not shown that the statute is palpably arbitrary, impractical, or unreasonable. I would therefore reverse and remand for trial on the merits. I do not believe that costs should be allowed.