755 P.2d 1191

**Richard J. CROFT, D.D.S., Petitioner–Appellant,**

v.

**ARIZONA STATE BOARD OF DENTAL EXAMINERS, Respondent–Appellee.**

**No. 1 CA–CIV 9575.**

Court of Appeals of Arizona, Division 1, Department C.

May 3, 1988.

Crampton, Woods, Broening & Oberg by James R. Broening, Lynda M. Pederson, Brian Holohan, Phoenix, for petitioner-appellant.

Robert K. Corbin, Atty. Gen. by Fred W. Stork, III, Chief Counsel, Civ. Div., and Guy B. Price, Richard F. Albrecht, Asst. Attys. Gen., Phoenix, for respondent-appellee.

## OPINION

SHELLEY, Judge.

Petitioner-appellant Richard J. Croft, D.D.S., a licensed dentist practicing in

Scottsdale, Arizona, was disciplined by the Arizona State Board of Dental Examiners for providing inadequate orthodontic treatment to a patient. Appellant sought judicial review of the Board's order. From a ruling of the trial court upholding the Board's decision, appellant brings this appeal. Appellant challenges the sufficiency of the evidence supporting the Board's ruling and the fairness of the administrative proceedings.

## FACTS AND PROCEDURAL HISTORY

On May 1, 1985, Pamela Jean Riethmuller filed a complaint against Dr. Croft with the Board, essentially stating the following: Dr. Croft, who had been Riethmuller's regular dentist, commenced orthodontic treatment in approximately May, 1982. After wearing a retainer and then bands, for 27 months, Riethmuller could see improvement in the alignment of her teeth. In September 1984, however, Dr. Croft removed her archwires, and within ten days the teeth began retracting. Dr. Croft advised Riethmuller not to worry, but rendered no further treatment during the following six weeks. At her next visit on October 31, 1984, Dr. Croft attempted to install a newly-made appliance on her teeth, which did not fit. Dr. Croft told her the appliance must be remade and rescheduled her for an appointment on November 15, 1984.

Riethmuller was dissatisfied with the progress of her treatment. She told Dr. Croft she wanted to obtain a second opinion. Riethmuller was seen by Dr. Charles Wait, an orthodontist, on November 14, 1984. Dr. Wait told her that her archwires should not have been removed without a retainer in place to prevent the teeth from moving, and that it would take at least 17 more months of wearing bands in order for her teeth to align correctly. Riethmuller did not return to Dr. Croft. Dr. Wait completed the treatment.

Meanwhile, Riethmuller filed a request for peer review of Dr. Croft by the Central Arizona Dental Society but did not obtain results which satisfied her. She initiated a complaint with the Board, alleging that her extended treatment was made necessary because of Dr. Croft's mistakes or errors in judgment. She sought reimbursement from Dr. Croft and compensation for expenses incurred with Dr. Wait.

The Board is the state agency charged with regulating the practice of dentistry in the state. Arizona Revised Statutes § 32–1201 *et seq.* Arizona Revised Statutes § 32–1263 provides that the Board may invoke disciplinary action against Arizona dentists for various reasons, including in subsection (1) "[u]nprofessional conduct, as defined in § 32–1201." Arizona Revised Statutes § 32–1263.01 describes permissible disciplinary actions. Arizona Revised Statutes § 32–1263.02 allows the Board to use investigative committees consisting of dentists and laypersons; such committees may conclude an investigation by recommending disciplinary action.

The Board interpreted Riethmuller's complaint as making the following charges against Dr. Croft: (1) inadequate history and clinical examination; (2) inadequate radiographs; (3) inadequate diagnosis; (4) inadequate treatment plan; and (5) inadequate orthodontics. The Board notified Dr. Croft of the charges and advised him that, if true, they would constitute a violation of A.R.S. § 32–1201(16)(n) describing as "unprofessional conduct" "any conduct or practice which does or would constitute a danger to the health, welfare or safety of the patient or the public." The Board summoned and received all records, documents and other evidence containing information pertinent to Riethmuller's care and treatment from Dr. Croft and from Dr. Wait.

The Board appointed a clinical evaluation committee composed of Drs. Ludwig, Pawloski and Running, and Mr. Lyman, a layman. It conducted a clinical evaluation on June 19, 1985. The doctors examined Riethmuller's teeth and reviewed the dental records of Drs. Croft and Wait. The committee found no substantiation for the first four charges of the complaint. The committee made no determination concerning the remaining charge of inadequate orthodontics.

The records, x-rays, models and other materials which the clinical evaluation committee examined, together with its findings, were forwarded to the deliberation committee of the Dental Board. That committee consisted of three dentists, Drs. Giordan, Moss and Running, and a lay member, again Mr. Lyman. On July 2, 1985, Dr. Croft was notified that the deliberation committee would meet to evaluate the evidence of the clinical evaluation committee on August 21, 1985, and would also consider any other information provided by Dr. Croft and Reithmuller.

Dr. Running's practice consisted of orthodontics, and he was relied upon by the other committee members as their orthodontic consultant. Dr. Croft and Riethmuller, the only other persons present at the meeting, were allowed to present information and were questioned by the committee. The committee chairman, Dr. Giordan, made it clear that the only charge left for consideration at this meeting was the charge of inadequate orthodontics.

In discussing the orthodontic treatment he had given to Riethmuller, Dr. Croft began by explaining that he had a three-phase treatment plan: (1) to develop the arches with Crozat appliances, (2) to go into straight-wire orthodontic treatment, and (3) to finish up with class two mechanics. He explained that the Crozat appliances developed the arches past the point that he wanted them to and so he kept Riethmuller in "twisted wire for an extended length of time." After Riethmuller was in the straight-wire treatment phase, Dr. Croft noticed that a mild cross-bite was developing. He removed the archwires to see if the lower arch would change in relationship to the upper arch. He decided he needed to use a Schwartz appliance. Its construction required a fresh impression of the teeth. Dr. Croft stated that there was an extended length of time between taking the impression and getting the Schwartz appliance in Riethmuller's mouth due to his teaching schedule and problems with laboratories he was using. Additionally, he claimed that Riethmuller did not keep appointments, but his record did not bear out this allegation. He confirmed that the initial Schwartz appliance did not fit. It had to be remade, and at this point communications between Riethmuller and himself broke down.

In answering questions of committee members, Dr. Croft indicated that, although he had been practicing dentistry for 30 years, he had stopped doing orthodontic work during the seven or eight years before treating Riethmuller, at which time he had decided to take up the practice again. His last refresher courses were in 1979 and 1980. He acknowledged initially estimating that Riethmuller's treatment would take 20 to 27 months, but that after 27 months had passed, she still needed an additional year of treatment. He admitted that if he were treating her now, after having acquired more experience, he could have completed the work in 27 months. He stated that part of his problem had been in not finding good laboratories which would consistently do quality work. He admitted starting Riethmuller's treatment before he had assembled all of his forms and materials for recommencing orthodontics. Additionally, the evidence showed that Dr. Croft had not kept Riethmuller properly advised of the course of her treatment.

While the hearing was taking place, evidence arose that suggested a discrepancy in what Riethmuller had been told she would be billed and in the figure Dr. Croft billed to her insurance company. Dr. Croft was unable at that moment to explain the discrepancy appearing in his records. An extended discussion on this subject took place. Eventually one of the committee members remarked that the discussion had gone far afield and that they needed to return to questioning about the orthodontic treatment, which they did.

When the committee began its deliberations, the committee chairman looked to Dr. Running for his comments as their orthodontic consultant. Dr. Running began by indicating that the most serious problem presented was the billing matter. The committee members began discussing whether discipline for misrepresentations to the insurance carrier was needed. The committee chairman reminded the commit-

tee that they only needed to decide the adequacy of the orthodontic treatment. He said that if the committee found there was evidence of misrepresentation of fees and possible fraud, it would have to make that allegation and hold a separate deliberation hearing on it. At that point, the committee returned its attention to the issue of orthodontic treatment. Drs. Moss and Running observed from models of Riethmuller's teeth that some of her teeth appeared worse in 1984 than in 1982. After addressing additional questions to Dr. Croft, Dr. Running stated his opinion that "[i]n the approximate two year period that [Riethmuller] was being cared for by Dr. Croft, from the start point to the progress point where the progress records were taken, then I would have expected much further and better orthodontic treatment, considering the cooperation of the patient, as to treating orthodontic cases in the standard of the community." Dr. Moss stated that Dr. Croft's intentions apparently had been good but that his ability did not match the intent. Dr. Giordan observed that Crozats "do a beautiful job" but are very difficult to manage. He agreed with Dr. Running that the treatment rendered in the period of time taken was not accomplishing the expected orthodontic results and was not up to the standards of the orthodontic community in this state. He stated that Dr. Croft did not have the expertise to render the treatment in a systematic way to accomplish the proper result. Additionally, Mr. Lyman was concerned about Dr. Croft's inadequacy in keeping Riethmuller advised as to what was going on with her treatment. The committee concluded with a discussion of what disciplinary measures were appropriate.

In making its formal written report, the committee found that the evidence substantiated the allegation of inadequate orthodontic treatment, falling short of that seen and expected in the orthodontic community, including both the general practitioner and the orthodontic specialist performing orthodontic treatment. The committee concluded that the facts constituted unprofessional conduct as defined in A.R.S. § 32–1201(16)(n) and called for disciplinary

action. The committee recommended a 36–month probation period for Dr. Croft with terms consisting of: (a) 42 hours of continuing education in orthodontics; (b) the presentation of five cases of orthodontic treatment with complete workup and progress reports; and (c) restitution of the orthodontic fees to Riethmuller and her insurance carrier.

The Board accepted the findings and conclusions of its deliberation committee and entered an order disciplining Dr. Croft in accordance with the committee's recommendation. Dr. Croft sought rehearing of his case and filed information which he believed demonstrated that he had not billed the insurance carrier more than he had billed his client. Among other things, Dr. Croft argued that the billing issue had tainted his hearing and that he had had inadequate notice that the issue would be discussed. The Board denied the request for rehearing after receiving a written analysis by its staff that the committee's findings, conclusions, and recommendations were supported by the evidence and that the billing issue did not affect the decision regarding the orthodontic treatment.

Dr. Croft next sought judicial review in the trial court. The matter proceeded to determination upon the administrative record and legal briefs in which the issues presented were argued by the parties. The trial court affirmed the order of the Board after finding that there was substantial evidence to support the Board's ruling, and that the evidence regarding the billing problem had not permeated the proceedings to the extent of offending due process. Dr. Croft appeals to this court, raising the same issues that he raised in the superior court.

## STANDARD OF REVIEW

The scope of the superior court's review pursuant to the Administrative Review Act, A.R.S. § 12–901 *et seq.*, is limited to deciding whether the administrative action was illegal, arbitrary, capricious or involved an abuse of discretion. *Arizona Board of Regents v. Superior Court*, 106 Ariz. 430, 477 P.2d 520 (1970). In review-

ing actions of the trial court under the act, appellate courts will only search the record to determine whether the evidence is of a substantial nature to support the lower court's decision. *Schade v. Arizona State Retirement System*, 109 Ariz. 396, 398, 510 P.2d 42, 44 (1973). In determining whether there is substantial evidence to support the agency ruling, the court must consider the evidence in the record that detracts from a finding as well as evidence which justifies it. *Universal Camera Corporation v. National Labor Relations Board*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed.2d 456 (1951). In order to reverse the administrative ruling, though, the court must find no substantial evidence to support the agency decision. *Smith v. Arizona Department of Transportation*, 146 Ariz. 430, 706 P.2d 756 (App.1985); *DeGroot v. Arizona Racing Commission*, 141 Ariz. 331, 868 P.2d 1301 (App.1984).

Additionally, it is well settled that in ruling on the sufficiency of evidence in administrative proceedings, courts should show a certain degree of deference to the judgment of the agency based upon the accumulated experience and expertise of its members. *Matter of Wickman*, 138 Ariz. 337, 674 P.2d 891 (App.1983).

## SUFFICIENCY OF THE EVIDENCE

Dr. Croft would have us find that the administrative record contains no evidence of a substantial nature to support the finding that Dr. Croft's orthodontic treatment was inadequate, and that the only explanation for the committee's recommendation that Dr. Croft be disciplined was that it was prejudiced by the billing issue. He argues that both the Central Arizona Dental Society's peer review process and the Board's clinical evaluation committee found that Dr. Croft's treatment had been appropriate, and therefore that it was arbitrary and capricious for the deliberation committee to reach the opposite conclusion without receiving any additional evidence. He argues that the billing issue dominated the hearing, and that there was a total absence

of any discussion of orthodontics, Reithmuller's teeth, or the records or models. He contends that there was no basis for Dr. Running, who was on both the clinical evaluation committee and the deliberation committee, to suddenly change his views and find the treatment inadequate. He argues that the committee's determination of his inadequacy of treatment was based on its subjective opinion rather than on evidence, pointing out specifically in his reply brief that no one other than the committee's own members testified that his treatment fell short of the standard of practice in the community.

■ We find that most of these issues are readily resolved against Dr. Croft merely by reviewing the record. First, we note that there is nothing in the record to suggest that the Central Arizona Dental Society is affiliated in any way with the Board. Dr. Croft acknowledged in his opening brief that no agreement was entered to make the peer review determination binding on the Board. Further, the record is very sketchy regarding how the peer review committee reached its conclusion. Under these circumstances, the fact that the peer review committee found in favor of Dr. Croft detracts very little from evidence the Board's deliberation committee used in finding that the orthodontic treatment was inadequate.

■ Dr. Croft has misstated the record in arguing that the Board's clinical evaluation committee found that the orthodontic treatment had been adequate. That committee found that the "treatment plan" Dr. Croft had elected to use was adequate, but the committee did not make any determination whether the "treatment" actually rendered had been adequate and left that for the deliberation committee to decide. Since inadequacy of the treatment plan and inadequacy of orthodontic treatment were two separate matters, there is no ground for concluding that Dr. Running reversed himself on the issue of inadequacy of orthodontic treatment merely by going from one committee to the other.

■ Similarly, there is no justification for Dr. Croft's contention that the record of the deliberation committee hearing is void of any discussion of orthodontics, Reithmuller's teeth, or the records and models. In fact, the record reveals extensive discussion of and reference to these matters. There is abundant evidence, most of it supplied through Dr. Croft's own testimony, showing that his treatment of Reithmuller had not gone according to plan, demonstrating precisely what had gone wrong, and giving reasons for the problems which developed.

■ The only part of Dr. Croft's argument which gives us any reason for concern is whether, even though the committee had evidence of what had gone wrong with Reithmuller's treatment, it could have concluded that such treatment had been "inadequate" without any expert testimony being given regarding the standard of care for orthodontic treatment in the community. The committee members relied solely on their own expertise, particularly that of Dr. Running, and not on the testimony of any expert witness, when it determined that the treatment fell below that standard of care.

It is well established that a doctor is not liable in negligence for mere mistakes in judgment in treating a patient, but is only liable where the treatment falls below the recognized standard of good medical practice. *Kalar v. MacCollum,* 17 Ariz.App. 176, 178, 496 P.2d 602, 604 (1972). Ordinarily, in malpractice cases, the applicable standard of care must be established by expert testimony unless the negligence is so grossly apparent that a layman could recognize it. *Harvey v. Kellin,* 115 Ariz. 496, 566 P.2d 297 (1977). We must determine whether such testimony, necessary in malpractice cases, was also necessary in this disciplinary proceeding where the dentist was charged with providing inadequate treatment, or whether it was appropriate

for the committee members to rely on their own expertise as to what is the applicable standard of care. We note that a majority of the members of both the Board and its investigative members were licensed dentists.[1] Arizona Revised Statutes § 41–1010(A)(3) provides that "the agency's experience, technical competence and specialized knowledge may be utilized in the evaluation of the evidence."

We are aware that there are cases holding that expert testimony appearing on the record establishing the applicable standard of care would be necessary. We conclude that the better view holds that since such opinion testimony could be disregarded by the Board, there is no reason to hold that it is required. As the Washington Court of Appeals stated in *Davidson v. State,* 33 Wash.App. 783, 785, 657 P.2d 810, 812 (1983):

It is well settled that when acting in a judicial capacity, an administrative board cannot base its findings and conclusions upon undisclosed documentary evidence or personal knowledge of the facts. However, an administrative agency, or its authorized agents, may use their experience and specialized knowledge to evaluate and draw inferences from the evidence presented to them. Moreover, courts of numerous jurisdictions, including Washington, have held that in a medical disciplinary proceeding an administrative board comprised of medical practitioners is competent to determine the propriety of medical conduct without the aid of expert testimony. *These courts have recognized that expert testimony regarding the propriety of medical conduct could be disregarded by a board of this type and in all probability would have little effect on the decision making process.* (Citations omitted; emphasis added)

Arizona Revised Statutes § 32–1295(C) states:

In all matters relating to discipline ... the Board shall, by rule and regulation, provide for receiving the assistance and

1. The Board consists of five licensed dentists, one licensed dental hygienist, and three laypersons. A.R.S. § 32–1203(A). The composition of the investigative committee was described previously in this opinion.

advice of denturists who have been previously certified pursuant to this chapter. The Board has adopted the required rule in Art. 12, Regulation of Denturists R4–11–1201(A), which requires that certified denturists be appointed to assist the Board in disciplinary matters.

The obvious purpose of the statute and the regulation is to insure that the Board will have the assistance and advice of denturists who are familiar with the standard of care required for the type of work that the practitioner who comes before the Board for disciplinary purposes is required to meet. Expert testimony is not required.

The situation is entirely different from that of a trial before a jury or a court. Neither jury nor judge would have knowledge of the standard of care required by a doctor or a dentist. Therefore, expert testimony is needed with respect thereto in order for the jury or the court to reach an informed decision.

### FAIRNESS OF PROCEEDINGS

■ Committees appointed by the Board pursuant to A.R.S. § 32–1263.02 have a combination of investigative and adjudicative functions. As the supreme court of the State of Washington stated in *Matter of Johnston*, 99 Wash.2d 466, 477, 663 P.2d 457, 464 (1983):

> [w]e detect no inherent unfairness in the mere combination of investigative and adjudicative functions, without more, that would prompt invocation of the appearance of fairness doctrine. The bare fact that the same administrative adjudicators also are clothed with investigative powers does not mean the case will be decided on an improper basis or that there will arise a prejudgment on the ultimate issues. We must presume the board members acted properly and legally performed their duties until the contrary is shown.

As a final matter, we find no merit to Dr. Croft's contentions that his due process rights were violated by the committee's concern at the hearing with his billing practices.

While investigating the charge of inadequacy of orthodontic treatment that had been made against Dr. Croft, the deliberation committee discovered evidence which suggested to it the possibility that Dr. Croft might be involved in billing improprieties. While it spent a portion of the hearing gaining information about that matter, and while committee members stated that if such an impropriety existed, they would be even more concerned about it than about the other charge, there is no suggestion in the record that the billing matter colored its decision regarding the orthodontic treatment rendered. It is clear from the record that the committee members understood that they were to decide only the issue of adequacy of treatment at that particular time, and that they would need to make separate charges against Dr. Croft, giving him notice and the opportunity to be heard, if they sought to pursue this other matter.

We affirm the trial court's ruling which upheld the decision of the Board.

CORCORAN, P.J., and FIDEL, J., concur.