2004 ND 225

John D. HUFF, M.D., Plaintiff and Appellant

v.

NORTH DAKOTA STATE BOARD OF MEDICAL EXAMINERS–INVESTIGATIVE PANEL B, Defendant and Appellee.

No. 20040151.

Supreme Court of North Dakota.

Dec. 14, 2004.

Ralph A. Vinje, Vinje Law Firm, Bismarck, N.D., for plaintiff and appellant.

John M. Olson, Olson Cichy Bliss, Bismarck, N.D., for defendant and appellee.

MARING, Justice.

[¶ 1] John D. Huff, M.D., appealed a district court order affirming a license suspension order of the North Dakota State Board of Medical Examiners ("Board"). Under the circumstances presented in this case, we conclude Huff's testimony established the requisite standard of care and his deviation from it. We affirm.

I

[¶ 2] The Board's Investigative Panel B issued a complaint against Huff arising out of the administration of an Ishihara test, or "I-test," to Shawn Anderson by a nurse and then by Huff. An Ishihara test is a test "for color vision deficiency that utilizes a series of pseudoisochromatic plates on which numbers or letters are printed in dots of primary colors surrounded by dots of other colors; the figures are discernible by individuals with normal color vision." *PDR Medical Dictionary* at 1804 (2d ed.2000). The complaint alleged, in part:

> Respondent has engaged in the performance of dishonorable, unethical, or unprofessional conduct likely to deceive, defraud or harm the public within the meaning of N.D.C.C. § 43–17–31(6), and/or Respondent engaged in gross negligence in the practice of medicine within the meaning of N.D.C.C. § 43–17–31(15), specifically:

> A patient being examined for a trucker's license had failed the Ishihara Test for color blindness which was administered by an LPN. Responded subsequently re-issued the test and proceeded to manually assist the patient by tracing out the numbers or symbols with the patient's index finder. The Respondent further permitted the patient to keep both eyes open during the exam. Upon conclusion of the test, Respondent crossed out the failed results on the patient's medical chart and deceptively wrote that the patient had passed the test once he had the exam explained to him. Respondent's actions violated appropriate protocol for the Ishihara Test.

[¶ 3] After a hearing, an administrative law judge ("ALJ") made the following recommended findings of fact, among others:

14. Huff said further the appropriate protocol for giving the I-test for someone with congenital color-blindness is to give the book of plates (exhibit 2B) to the patient, give the patient some instructions, and give them three seconds to identify the plates. . . .

15. The I-test can also be used to evaluate someone with acquired color blindness. Huff said that when giving it to someone with this condition the key is to give them more time with each chart and to coach them. He said that in this circumstance the patient is allowed to trace the figures with a brush or a finger. He said when giving the I-test there needs to be adequate lighting.

. . . .

24. Huff also said that Winter's writing that Anderson had missed all of the plates except one of those plates he was shown (thirteen plates missed) was totally inconsistent with someone who had 20/20 vision, if the test is administered by a skilled individual.

25. Huff said that based on what he perceived to be Anderson's problem he went ahead and tried to evaluate Anderson for being affected by toxic substances. . . .

26. When Huff administered the I-test to Anderson he said [he] explained to Anderson that he could take as much time as he wanted on the test, that he could hold the book in any position he wanted, and that he could also take his finger and trace the numbers or images. Huff said he explained that and showed Anderson how to do it by taking his hand and showing him how to trace. Huff said that he followed Anderson through all of the plates, coaching him as he went through the book, reminding him to trace and to take his time to identify the charts. Huff said he actually helped Anderson trace one of the plates, the first plate in the I-test, by taking his finger and showing him how to trace the number and then told him to do the same on all of the other images, saying that if he could identify them without tracing that was fine, but if he could not, to take his finger and trace out the figure. Huff said that he would occasionally prompt Anderson on other figures, verbally reminding him that he could trace. Huff said that Anderson could see the image on plate number one, the one which Huff traced with him. Huff said that given enough time with verbal coaching and prompting him, Anderson could identify all of the images (numbers or patterns) on the other plates, some presenting more difficulty than others. Huff said he gave Anderson encouragement throughout the test.

27. At the conclusion of administering the I-test to Anderson, Huff wrote a note on Anderson's chart, "was able to identify all the figures once he had the exam explained to him." Then, Huff marked through the previous results for the I-test, the results listed on the chart by Winter. . . .

29. At the hearing, Huff agreed that if the evidence showed that he had taken Anderson's finger with his hand and traced the figures for each of the plates of the I-test found in the book, exhibit 2B, it would have been inappropriate for him to do so.

. . . .

33. The rules of the I-test are rules for determining congenital color-blindness. Huff used the test for evaluation not in accordance with the I-test rules. Huff said there is no[] set of rules for use of the I-test as he used it. Huff said he relied on his training and experience.

. . . .

37. Sandy Winter is an LPN at TRE. She is certified as an ophthalmic assistant and an optometric assistant. She has experience over the years in giving the I-test and has been trained to do it....

38. Winter checked Anderson in at TRE on December 14, 2000. .... She gave him the I-test. She said that she explained the I-test to him and then with an occluder had him look one eye at a time at the book, at each of the plates in order. Exhibit 2B. Anderson correctly identified plate numbers 1 and 9 with either eye. She said that Anderson had difficulty with all of the other plates frequently saying that he could not see anything....

41. Marlene Johnson is a certified ophthalmic assistant and certified optician at TRE....

43. Johnson was with Huff when he began examining Anderson. She watched Huff examine Anderson and g[a]ve him some tests. She watched Huff give Anderson the I-test....

44. Johnson said that after Anderson told Huff that he could not see most of the figures, Huff helped Anderson by taking his hand and helping him physically trace the figures, encouraging him and coaching him as they went. Johnson said that Anderson did not trace any of the figures on his own. Even then, she said, Anderson was having trouble and several times said he couldn't see the figures, but Huff encouraged him by saying, "can't you feel the figure." Again, Johnson said that Huff continually tried to help Anderson by physically helping him trace and by coaching and encouraging him.

....

47. After Johnson testified, Huff denied tracing with Anderson's finger on more than one plate. Huff said that if the I-test would have been given with him holding Anderson's finger and helping him trace on every figure of the I-test, that would be inappropriate, unprofessional, and gross negligence. Huff said he "can not image it being done."

....

56. Anderson said that he had much difficulty with the first test given by Winter. He said that he had the same amount of difficulty taking the test given by Huff.

57. Anderson said that Huff assisted him at the beginning of the test. He said that Huff took his finger with Huff's hand and traced figures during the test, more than three times. He said that if he did any figures without physical assistance from Huff it was after a long while. He said that he could do the test after Huff showed him by tracing with him.

[¶ 4] In analyzing the evidence, the ALJ found:

The ALJ chooses to believe the evidence of Anderson which was supported by the evidence of Johnson and Farris. There is no doubt, based on that evidence, that Huff did give the I-test to Anderson when he was dilated and that he actually helped Anderson with the I-test by taking Anderson's finger with his hand and tracing the numbers and figures on the I-test with him. Huff traced with Anderson's hand more than once, probably more than three times.

Huff crossed out Winter's findings of the I-test she gave Anderson and then wrote that Anderson "was able to identify all the figures once he had the examination explained to him." Exhibit 1.

Huff did not appropriately conduct the I-test. Huff deceptively wrote that Anderson was able to identify all the figures of the I-test, implying that he

passed the test. In fact, when Huff initially wrote a note to Dr. Andrzejewski he implied the same. Exhibit 1, page 4. When Huff later wrote to Dr. Andrzejewski about Anderson he specifically said that "once the patient had the test explained to him he was able to identify all of the plats [sic] with no difficulty . . . [m]y impression is a normal color test, a normal eye exam and an excellent candidate for his truck-driving license." Exhibit 1, page 3.

. . . .

The evidence shows, by the greater weight of the evidence, that Huff's actions in crossing out Winter's failed I-test results on Anderson's medical chart, writing something different, and then, in effect, writing to Dr. Andrzejewski that Anderson had passed the I-test, under the circumstances, is dishonorable, unethical and unprofessional conduct likely to deceive, defraud or harm the public, and further, was gross negligence. Huff acknowledged that if he did what is alleged he did violate the law as alleged. The evidence shows he did what was alleged. In the face of two contrary witnesses, Huff continues to deny that he actually held Anderson's finger with his hand and helped him to trace figures on the I-test. Huff is not to be believed.

The ALJ concluded, among other things:

2. The evidence shows, by the greater weight of the evidence, that Huff violated the provisions of N.D.C.C. § 43–17–31(15) and ( []6) by his actions on December 14, 2000, in that he inappropriately aided a patient on the Ishihara Test, crossed out a nurse[']s recording showing the patient failed the test, wrote a statement on the patient's record indicating that the patient had passed the test, and wrote to another physician indicating that the patient had passed the test, identifying all of the plates, when the patient did not identify all of the plates except with help by Huff that was inappropriate. Such actions were dishonorable, unethical, and unprofessional and likely to deceive, defraud, or harm the public, in violation of N.D.C.C. § 43–17–31( []6), and were gross negligence in the practice of medicine within the meaning of N.D.C.C. § 43–17–31(15).

[¶ 5] The ALJ recommended an order suspending Huff's license. The Board adopted the ALJ's recommended findings, conclusions and order, entering the following order:

Dr. John D. Huff's license to practice medicine in North Dakota is suspended for one year, but none of the suspension shall be actually invoked at this time provided that Dr. Huff, within one year from the date of this order, pay to the Board a $2,000 fine under such terms and conditions as the Board shall specify by separate letter; attend an ethics course of the Board's choosing as the Board shall specify by separate letter; and pay to the Board the sum of the actual costs, including reasonable attorney's fees, incurred by the Board and Investigative Panel B in the investigation and prosecution of the case, under terms and conditions as the Board shall specify by separate letter.

[¶ 6] Huff appealed to the district court, which affirmed the Board's order. The dispositive issue is whether or not expert testimony was necessary about the required standard of care and whether or not Huff deviated from that standard.

## II

[¶ 7] Section 43–17–03, N.D.C.C., requires the governor to appoint a state board of medical examiners consisting of eight doctors of medicine, a doctor of osteopathy, and two public members,

who "must ... [n]ot be affiliated with any group or profession that provides or regulates health care in any form." Section 43–17–30.1 authorizes the Board to take disciplinary action against a licensed physician. Section 43–17–31, N.D.C.C., provides, in part:

Disciplinary action may be imposed against a physician upon any of the following grounds:

. . . .

6. The performance of any dishonorable, unethical, or unprofessional conduct likely to deceive, defraud, or harm the public.

. . . .

15. Gross negligence in the practice of medicine.

[¶ 8] Administrative agency decisions are subject to limited judicial review. *See, e.g., Elshaug v. Workforce Safety & Ins.,* 2003 ND 177, ¶ 12, 671 N.W.2d 784:

Under N.D.C.C. §§ 28–32–46 and 28–32–49, the district court, and this Court on further appeal, must affirm an administrative agency decision unless one of the following is present:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

On appeal from an administrative agency decision, we do not substitute our judgment for that of the agency or make independent findings, determining only if a reasoning mind reasonably could have concluded the findings were supported by the weight of the evidence in the entire record, and deferring to the hearing officer's opportunity to judge the credibility of witnesses. *Aamodt v. North Dakota Dep't of Transp.,* 2004 ND 134, ¶ 12, 682 N.W.2d 308. An agency's decisions on questions of law are fully reviewable. *Linser v. Office of Attorney General,* 2003 ND 195, ¶ 6, 672 N.W.2d 643.

[¶ 9] Huff contends that when a professional's license is at stake, expert testimony is necessary on the applicable standard of professional conduct and on the issue of whether that standard was met. "Disciplinary proceedings differ significantly ... from civil legal malpractice actions." *In re Disciplinary Action Against McKechnie,* 2003 ND 22, ¶ 16, 656 N.W.2d 661. We believe there are also significant differences between physician disciplinary proceedings and medical malpractice actions. In the context of lawyers, disciplinary proceedings deal with minimum levels of conduct and, in large part, the rules themselves set the standard of "conduct" while an action for malpractice deals with the reasonableness of a lawyer's conduct under particular circumstances. *Id.* Under N.D.C.C. § 43–17–31, however, physician disciplinary proceedings can be based on both types of conduct.

[¶ 10] We recognize the propriety of expert testimony in physician disciplinary proceedings and its necessity in cases involving standards of physician conduct. A majority of the jurisdictions that have addressed the subject require expert testimony when a physician's license is at stake. *See* cases collected in *Martin v. Sizemore*, 78 S.W.3d 249, 271 n. 12 (Tenn. Ct.App.2001); and James J. Watson, Annotation, *Necessity of Expert Evidence in Proceeding for Revocation or Suspension of License of Physician, Surgeon, or Dentist*, 74 A.L.R.4th 969 (1989).

> [C]ompetent expert testimony must be introduced if the issues in the administrative proceeding require establishing the applicable standards of professional conduct and determining whether particular conduct fell below these standards. Requiring the introduction of expert testimony in cases of this sort protects the fairness of the contested case proceedings, the integrity of the administrative record, and the right to meaningful judicial review of administrative decisions.

*Sizemore*, 78 S.W.3d at 271 (citation omitted). The *Sizemore* court posited four reasons for requiring expert testimony in such cases: "First, persons facing the loss or suspension of their professional license in a contested case proceeding have the right to confront, cross-examine, and rebut the evidence against them," *id.* at 269; "Second, an administrative agency's factfinding must be limited to evidence properly included in the administrative record," *id.* at 270; "Third, many administrative boards and agencies are no longer comprised solely of persons with expertise in the regulated field or profession" and expert testimony is necessary "to enable the board members lacking expertise in the profession at issue to perform their adjudicatory responsibilities," *id.;* and "Finally, permitting board members to substitute their own expert opinions for necessary expert testimony undermines the ability of reviewing courts to determine whether the agency's decision is based on substantial and material evidence," *id.* at 271.

[¶ 11] The Board asserts that expert testimony is not necessary, relying on *Ferguson v. Hamrick*, 388 So.2d 981, 983 (Ala. 1980) (no prohibition against board members relying on their expertise where the legislature had not required expert testimony and had vested authority to judge professional conduct in a body wholly composed of medical experts); *Croft v. Arizona State Bd. of Dental Exam'rs*, 157 Ariz. 203, 755 P.2d 1191, 1198 (Ct.App. 1988) (expert testimony not necessary in a disciplinary proceeding when a majority of the Board and its investigative members were licensed dentists "familiar with the standard of care required"); *Jutkowitz v. Department of Health Servs.*, 220 Conn. 86, 596 A.2d 374, 387–88 (1991) ("expert testimony is necessary in a licensing matter unless the board that hears and decides a case is composed of at least a majority of experts in the field"); *Little v. North Carolina State Bd. of Dental Exam'rs*, 64 N.C.App. 67, 306 S.E.2d 534, 539 (1983) (a board composed of licensed dental professionals is qualified within itself to judge whether a dentist met the required standard of proficiency); and *Davidson v. State*, 33 Wash.App. 783, 657 P.2d 810, 812 (1983) (expert testimony subject to cross-examination is not necessary before a disciplinary board "almost exclusively composed of experts in the chiropractic field" and "[c]onsequently ... entitled to rely on its own specialized knowledge"). The Board also contends that, even if expert testimony is ordinarily required, it was not necessary in this instance because expert testimony would not have been helpful, the conduct was so egregious expert testimony was unnecessary or fell under an "egregious blunder"

exception, or the requisite expert testimony was provided by Huff.

[¶ 12] Like the court in *Balian v. Board of Licensure in Med.*, 722 A.2d 364, 369 (Me.1999), we agree that if an act is blatantly illegal or improper, or if a licensee admits to a violation, a disciplinary board need not introduce expert evidence to establish the necessary standard. However, in a physician disciplinary proceeding before a board like this one, having some members who are not medical experts and physician members who are medical professionals but may not be experts in the field of medicine practiced by the physician appearing before them, we believe requiring expert testimony in a case in which such testimony would be helpful will best protect "the fairness of the contested case proceedings, the integrity of the administrative record, and the right to meaningful judicial review." *Martin v. Sizemore*, 78 S.W.3d 249, 271 (Tenn.Ct.App.2001).

[¶ 13] Expert testimony was provided to the Board in the following colloquy between Huff, who is certified as an ophthalmologist, a physician who has specialized in the treatment of eye diseases, and the Board's attorney:

MR. OLSON:

Now, I believe you already testified to the fact that if this test would have been given the way that Marlene Johnson described the way that you gave the Ishihara test, you concluded that that would be inappropriate, correct? The way Marlene Johnson described it.

DR. HUFF:

Me holding the patient's finger ...

MR. OLSON:

Yes.

DR. HUFF:

... and guiding it?

MR. OLSON:

Yes.

DR. HUFF:

Yes, that's inappropriate.

MR. OLSON:

And that would be unprofessional?

DR. HUFF:

Yes.

MR. OLSON:

And that would even be gross negligence, if you're ah ...

DR. HUFF:

Well, I can't imagine it being done.

[¶ 14] Huff asserts he "did not give Mr. Anderson the I-test in the manner described by Ms. Johnson." "It is the agency's responsibility to assess the credibility of witnesses and to resolve conflicts in the evidence." *Kraft v. State Bd. of Nursing*, 2001 ND 131, ¶ 25, 631 N.W.2d 572. Determining the credibility of witnesses and the weight to be given their testimony is the exclusive province of the hearing officer. *Torstenson v. Moore*, 1997 ND 159, ¶ 8, 567 N.W.2d 622. The Board chose "to believe the evidence of Anderson which was supported by the evidence of Johnson and Farris," and found "Huff is not to be believed." There is evidence from which the Board could reasonably find that Huff did "give Mr. Anderson the I-test in the manner described by Ms. Johnson." The Board found that "Huff's actions ... [were] dishonorable, unethical and unprofessional conduct likely to deceive, defraud or harm the public, and further, was gross negligence." From our review of the record, we conclude a reasoning mind reasonably could have concluded that the Board's findings were supported by the weight of the evidence in the entire record.

**III**

[¶ 15] Our conclusion that a reasoning mind reasonably could have concluded that the Board's findings were supported by

the weight of the evidence in the entire record renders resolution of Huff's other issues unnecessary. We need not address questions, the answers to which are unnecessary for the determination of an appeal. *Olander Contracting Co. v. Gail Wachter Invs.*, 2002 ND 65, ¶ 48, 643 N.W.2d 29; *Hospital Servs., Inc. v. Brooks*, 229 N.W.2d 69, 71 (N.D.1975).

## IV

[¶ 16] Affirmed.

[¶ 17] WILLIAM A. NEUMANN, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.

VANDE WALLE, Chief Justice, concurring specially.

[¶ 18] I agree with the majority opinion that, absent a blatantly illegal or improper act on the part of the holder of a medical license, expert testimony the licensee has violated the standards of the profession is necessary in order to suspend or revoke that license. The majority opinion, relying on *Martin v. Sizemore*, 78 S.W.3d 249 (Tenn.Ct.App.2001), outlines well the reasons for that requirement.

[¶ 19] It is obvious from the record before us, that the State Board of Medical Examiners and its counsel at the administrative hearing believed no such expert testimony was necessary because the Board itself is the expert. But, as the majority opinion notes, not all members of the Board are physicians and those members who are physicians will not always be expert in the area of medicine at issue. Yet, employing another exception to the requirement of expert testimony, apparently from the decision in *Balian v. Board of Licensure in Med.*, 722 A.2d 364 (Me. 1999), the majority nevertheless affirms the decision of the agency based on Dr. Huff's own testimony admitting that his actions, if performed in the manner alleged, would be inappropriate and unprofessional. Huff, of course, denies he performed the test in the manner alleged.

[¶ 20] To the extent this case turns on the credibility of witnesses before the Board, I concur in the result reached by the majority opinion. Credibility is not an issue this Court decides on appeal. I am uncomfortable with the scant evidence of professional misconduct the attorney for the Board was able to wring from Huff's own lips. While I cannot conclude it was error on the part of the ALJ or the Board to rely on Huff as their expert witness, there is surely a certain irony in so doing, particularly when his credibility on other matters is rejected by the ALJ and by the Board. Nevertheless it is the evidence upon which the Administrative Law Judge relied and, in adopting the recommended findings of the ALJ, the evidence upon which I must assume the Board of Medical Examiners relied.

[¶ 21] I submit, however, that in the future it would be audacious for the Board to enter into these proceedings without the benefit of an expert witness, expecting to extract from the licensee the necessary expert testimony to sustain the charge of misconduct.

[¶ 22] Gerald W. Vande Walle, C.J.